UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 92-4822
Summary Calendar
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MATEEN YUSUF SHABAZZ, a/k/a
EDWARD L. EBERHART, a/k/a
EDWARD WALLACE, and
KEITH LAMAR PARKER,

Defendants-Appellants.

_____

Appeal from the United States District Court for the
Eastern District of Texas
_____
(June 4, 1993)
(                              )


Before GARWOOD, JONES and EMILIO M. GARZA, Circuit Judges.

GARWOOD, Circuit Judge:

Defendants-appellants Mateen Yusuf Shabazz (Shabazz) and Keith Lamar Parker (Parker) were convicted on drug possession charges. They argue that evidence discovered in a warrantless search of the car in which they were traveling should have been suppressed, that the trial court erroneously failed to submit a "mere presence" jury instruction, and that their convictions rest on insufficient evidence. We affirm.

**Facts and Proceedings Below**

On July 10, 1991, Shabazz and Parker were traveling in a 1976 Chevrolet Malibu on Interstate 10 in Beaumont, Texas, when they were pulled over by two officers of the Beaumont Police Department for exceeding the speed limit. Officer Gerald LaChance approached Shabazz, who had been driving the car, and asked him to step to the rear of the vehicle with his driver's license. Shabazz complied and produced what turned out to be a false driver's license bearing the name Edward (or Edwin) L. Wallace. Parker remained in the vehicle. While running a computer check on Shabazz's license, the officers questioned Shabazz and Parker individually. Comparing notes, the police officers determined that Shabazz and Parker had given conflicting answers concerning their recent whereabouts. Shabazz had said that he and Parker had been visiting Parker's sister in Houston, where they had been for a week, since the Fourth of July. Parker, on the other hand, had said that they had only been in Houston since the eighth, just two days prior to the stop.

Based upon the conflict in their stories, and Officer Froman's belief that Parker seemed nervous, the officers decided to seek consent to search the car. Because Parker had represented himself as the owner of the car, he was asked if he would consent to a search of the vehicle. Parker gave both written and oral consent to a search.

During the search, Officer LaChance discovered a Phillips-head screwdriver on the front floorboard of the driver's side of the car. He also observed that the screws in the front driver's side air conditioner vent had shiny nicks on them and appeared to be

2

loose. Using the screwdriver, Officer LaChance loosened the screws. The vent thereupon fell open and out of it tumbled a number of plastic baggies, which contained over 300 grams of crack cocaine and over 100 grams of powder cocaine. Shabazz and Parker were immediately arrested.

A grand jury returned a two-count indictment against Shabazz and Parker charging them with possession with intent to distribute cocaine and possession with intent to distribute a cocaine mixture and substance containing cocaine base, in violation of 21 U.S.C. § 841(a). A jury trial was held in the Eastern District of Texas and defendants were convicted on both counts. The court sentenced Parker to 216 months' imprisonment, to be followed by 5 years of supervised release, and a $100 special assessment. Shabazz received a 192 month sentence, 5 years of supervised release, and a $100 special assessment. Parker and Shabazz now appeal their convictions.

### Discussion

Appellants raise three arguments on appeal. They argue that the trial court erred by failing to suppress the evidence found in the search of the automobile, that the court erred by failing to give the jury a "mere presence" instruction, and that the evidence was insufficient to prove that they knowingly possessed the cocaine. We will address these issues in turn.

I. Suppression of Evidence

Prior to trial, appellants[1] moved to suppress the evidence

---

[1] The government initially challenged the standing of Shabazz, who was driving the car but made no claim to be its owner, to

3

found in the search of the automobile as the fruits of a Fourth Amendment violation. Following an evidentiary hearing, the district court denied the motion. On appeal, we review the district court's findings of fact for clear error; conclusions of law are examined *de novo*. *See United States v. Coleman*, 969 F.2d 126, 129 (5th Cir. 1992). The evidence is viewed most favorably to the party prevailing below, except where such a view is inconsistent with the trial court's findings or is clearly erroneous considering the evidence as a whole. *Id*. *See also United States v. Maldonado*, 735 F.2d 809, 814 (5th Cir. 1984).

The Fourth Amendment prohibits unreasonable searches and seizures. There is no question but that the stopping of a vehicle and the detention of its occupants is a "seizure" within the meaning of the Fourth Amendment. *See Delaware v. Prouse*, 99 S.Ct. 1391, 1396 (1979). It is clear that, as in the case of pedestrians, searches and seizures of motorists who are merely *suspected* of criminal activity are to be analyzed under the framework established in *Terry v. Ohio*, 88 S.Ct. 1868 (1968). *See United States v. Sharpe*, 105 S.Ct. 1568 (1985) (applying *Terry* analysis to stop of vehicles suspected of transporting drugs);

_____

challenge the search as violative of the Fourth Amendment. The district court ruled that Shabazz had the requisite standing. As the government does not raise the issue of standing on appeal, and in light of our affirmance of the district court's denial of the motion to suppress, we do not address the district court's ruling in this respect. *Cf. Rakas v. Illinois*, 99 S.Ct. 421 (1978) (passengers in a car driven by its owner did not have standing to raise the Fourth Amendment); *United States v. Lee*, 898 F.2d 1034 (5th Cir. 1990), *cert. denied*, 113 S.Ct. 1057 (1993) (driver of and passenger in a truck rented by a third party and being operated at third party's behest have standing to raise the Fourth Amendment).

4

*United States v. Brignoni-Ponce*, 95 S.Ct. 2574 (1975) (applying *Terry* analysis to stop of a vehicle suspected of transporting aliens).[2]  Of course, in this case appellants were not merely suspected of illegal behavior, but were actually observed by the stopping officer committing an offense, a Class C misdemeanor, and were stopped on that basis.  A routine traffic stop is a limited seizure that closely resembles an investigative detention.  *See Berkemer v. McCarty*, 104 S.Ct. 3138, 3150 (1984) ("the usual traffic stop is more analogous to a so-called '*Terry* stop' than to a formal arrest" for *Miranda* warning purposes).  Also, both the Supreme Court and the Fifth Circuit have used *Terry* to analyze cases in which motorists were stopped for violating traffic laws. *See Pennsylvania v. Mimms*, 98 S.Ct. 330 (1977) (per curiam) (stop for expired license plate); *United States v. Kelley*, 981 F.2d 1464 (5th Cir. 1993), *petition for cert. filed*, (April 19, 1993) (stop for seat belt violation); *United States v. Lee*, 898 F.2d 1034, 1040 (5th Cir. 1990), *cert. denied*, 113 S.Ct. 1057 (1993) (stop for speeding).

Under *Terry*, the judicial inquiry into the reasonableness of a search or seizure "is a dual oneSQwhether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."  *Terry*, 88 S.Ct. at 1879.

---

[2]    Some of our cases have termed this practice a "vehicle frisk."  *See United States v. Hernandez*, 901 F.2d 1217, 1220 (5th Cir. 1990); *United States v. Basey*, 816 F.2d 980, 991 (5th Cir. 1987).

A.

Appellants do not argue, nor could they, that the initial stop of their vehicle for speeding was improper. This is so whether or not *Terry* applies. *See United States v. Causey*, 834 F.2d 1179, 1184 (5th Cir. 1987) (en banc); *United States v. Basey*, 816 F.2d 980, 990 (5th Cir. 1987).[3] Appellants do argue, however, that when the officers interrogated them about their visit to Houston, the detention exceeded the reasonable scope of the stop's original purpose and thus violated *Terry*'s second prong. Appellants rely principally upon the Tenth Circuit's decision in *United States v. Guzman*, 864 F.2d 1512 (10th Cir. 1988). In *Guzman*, a New Mexico police officer stopped Guzman, the driver of a rented Cadillac with Florida plates, and his wife for seat belt violations. Guzman gave the officer his license, registration, and car rental agreement.

---

[3]    Although some courts have held that a lawful traffic stop may nonetheless violate the Fourth Amendment if the stop was merely a pretext to allow officers to search for contraband, *see United States v. Smith*, 799 F.2d 704, 708 (11th Cir. 1986); *United States v. Guzman*, 864 F.2d 1512, 1517 (10th Cir. 1988), this Court has rejected that position. In *Causey*, we said that "so long as police do no more than they are objectively authorized and legally permitted to do, their motives in doing so are irrelevant and hence not subject to inquiry." 834 F.2d at 1184. We note too that most circuits agree with *Causey*. *See United States v. Cummins*, 920 F.2d 498, 500-01 (8th Cir. 1990), *cert. denied*, 112 S.Ct. 428 (1991); *United States v. Trigg*, 878 F.2d 1037, 1041 (7th Cir. 1989), *cert. denied*, 112 S.Ct. 428 (1991); *United States v. Hawkins*, 811 F.2d 210, 212-15 (3d Cir.), *cert. denied*, 108 S.Ct. 110 (1987); *see also United States v. Rusher*, 966 F.2d 868, 885-89 (4th Cir.), *cert. denied*, 113 S.Ct. 351 (1992) (Luttig, J., concurring in part); *cf. United States v. French*, 974 F.2d 687, 692 n.4 (6th Cir. 1992), *cert. denied*, 113 S.Ct. 1012 (1993). Even if "pretext" could theoretically render an otherwise lawful stop invalid, the district court found that the stop was "a valid, *nonpretext* traffic stop for speeding" (emphasis added), and this finding is adequately supported by the evidence and is not clearly erroneous.

6

The officer reviewed the documents and concluded that they were in order. At this point, rather than issue a warning or a citation, the officer investigated further by examining the odometer and extensively questioning the motorists. His suspicions aroused, the officer asked if the two were carrying contraband. Guzman denied the allegation and invited the officer to search the car. The search revealed cocaine concealed in the car, whereupon Guzman and his wife were arrested. The *Guzman* court held that the officer's actions violated the Fourth Amendment:

> "An officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation. When the driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning. In order to justify a temporary detention for questioning, the officer must also have reasonable suspicion of illegal transactions in drugs or of any other serious crime." *Id.* at 1519.

The reasoning of *Guzman* was apparently applied by this Court in the similar case of *United States v. Kelley, supra*. As in *Guzman*, the motorists in *Kelley* were stopped for seat belt violations and, subsequent to questioning by police officers, were discovered to be in possession of drugs.[4] "We do not disagree with the Tenth Circuit," said *Kelley*, "that, under appropriate circumstances, excessive questioning about matters wholly unrelated to the purpose of a routine traffic stop may violate the Fourth Amendment." 981

---

[4] *Kelley* is also strikingly similar to this case. As here, the *Kelley* motorists were coming from Houston, were stopped on I-10 in Beaumont, gave conflicting answers, appeared nervous, and eventually consented to a search of the car. Also, the arresting officers in *Kelley*, as here, were the ever-vigilant LaChance and Froman of the Beaumont Police Department.

F.2d at 1470.

The Fourth Amendment injury found in *Guzman* and assumed *arguendo* in *Kelley*[5] was a violation of *Terry*'s second prong: that the scope of a search must be reasonably related to its initial justification. *See Terry*, 88 S.Ct. at 1879; *id.* at 1878 ("The scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible.") (quoting *Warden v. Hayden*, 87 S.Ct. 1642, 1652 (1967) (Fortas, J., concurring). Appellants argue that Officers LaChance and Froman violated the second *Terry* prong by asking them questions about their stay in Houston. Such interrogation, they maintain, was wholly unrelated to the initial justification for the stop, that is, speeding. This argument reflects some confusion about precisely what constitutes a violation of the "scope" requirement.

At the outset, we reject any notion that a police officer's questioning, even on a subject unrelated to the purpose of the stop, is itself a Fourth Amendment violation. To be sure, one can find suggestive statements to this effect in the case law. *See, e.g., Kelley*, 981 F.2d at 1470 ("under appropriate circumstances, *extensive questioning* about matters wholly unrelated to the purpose of a routine traffic stop may violate the Fourth Amendment") (emphasis added). Mere questioning, however, is neither a search nor a seizure. *See, e.g., Florida v. Bostick*, 111 S.Ct. 2382, 2386

---

[5] *Kelley* did not decide if the Fourth Amendment had been violated because it concluded that defendant's consent to the search cured any violation that might have occurred. *Guzman* did hold that the Fourth Amendment had been violated but then remanded to determine if the defendants had given a valid consent to the search.

(1991) ("Since *Terry*, we have held repeatedly that mere police questioning does not constitute a seizure.").[6]  Rather, *Terry*'s second prong is concerned with detentions, in other words, seizures.  *See Florida v. Royer*, 103 S.Ct. 1319, 1325 (1983) (plurality opinion) ("The scope of the *detention* must be carefully tailored to its underlying justification.") (emphasis added).  This is not to say that questioning is unrelated to the determination that a detention has exceeded its lawful duration.  In a garden variety *Terry* stop, the nature of the questioning during a later portion of the detention may indicate that the justification for the original detention no longer supports its continuation.  Thus, when a police officer reasonably suspects only that someone is carrying a gun and stops and frisks that person, the officer, after finding nothing in a pat down, may not thereafter further detain the person merely to question him about a fraud offense.  This is not because the questioning itself is unlawful, but because at that point suspicion of weapons possession has evaporated and no longer justifies further detention.  When the officer is satisfied that the individual is not carrying a gun, the officer may not detain him longer to investigate a charge lacking reasonable suspicion.  At that point, continuation of the detention is no longer supported by the facts that justified its initiation.  Thus, detention, not questioning, is the evil at which *Terry*'s second prong is aimed.

Here, appellants cannot successfully claim that the detention

---

[6]    *See also INS v. Delgado*, 104 S.Ct. 1758, 1762-63 (1984); *Florida v. Royer*, 103 S.Ct. 1319, 1324 (1983)(plurality opinion); *id.* at 1338 n.3 (Rehnquist, J., dissenting); *Terry*, 88 S.Ct. at 1886 (White, J., concurring).

exceeded its original scope. Appellants concede, and we have no doubt, that in a valid traffic stop, an officer can request a driver's license, insurance papers, vehicle registration, run a computer check thereon, and issue a citation. *See Kelley*, 981 F.2d at 1469; *Guzman*, 864 F.2d at 1519. In this case, Officer LaChance asked Shabazz to exit the vehicle[7] and produce his driver's license. He then called in for a computer check of the license. The questioning that took place occurred while the officers were waiting for the results of the computer check. Therefore, the questioning did nothing to extend the duration of the initial, valid seizure. Because the officers were still waiting for the computer check at the time that they received consent to search the car, the detention to that point continued to be supported by the facts that justified its initiation. *Cf. United States v. Sharpe*, 105 S.Ct. 1568, 1576 (1985) ("Clearly this case does not involve any delay unnecessary to the legitimate investigation of the law enforcement officers.").

Support for our conclusion can be found in one of *Guzman*'s Tenth Circuit progeny, *United States v. Walker*, 933 F.2d 812 (10th Cir. 1991), *cert. denied*, 112 S.Ct. 1168 (1992), another traffic stop case. Significant for our purposes is the following statement by the *Walker* court:

> "Under the reasoning of *United States v. Morales-Zamora*,
> 914 F.2d 200 (10th Cir. 1990), our determination that the
> defendant was unlawfully detained might be different if
> the questioning by the officer *did not delay the stop*

---

[7]     Ordering someone to get out of a car is itself a "seizure," but a constitutionally permissible one when done incident to a lawful traffic stop. *See Pennsylvania v. Mimms, supra*.

10

*beyond the measure of time necessary to issue a citation.*
For example, this case would be changed significantly if
the officer asked the same questions *while awaiting the*
*results of an NCIC* [National Crime Information Center]
*license or registration inquiry.*"  *Id.* at 816 n.2
(emphasis added).[8]

So too in this case, appellants cannot complain of questioning that took place during the pendency of a computer check.  While appellants were under no obligation to answer the questions, the Constitution does not forbid law enforcement officers from asking.

We recognize that a detention may be of excessively long duration even though the officers have not completed and continue to pursue investigation of the matters justifying its initiation. *See, e.g., Sharpe*, 105 S.Ct. at 1573-74; *Cf. Royer*, 103 S.Ct. at 1325 (1983) ("an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop").  A prolonged investigative detention may be tantamount to a *de facto* arrest, a more intrusive custodial state which must be based upon probable cause rather than mere reasonable suspicion. In *Sharpe*, the Court held that a defendant who was suspected of transporting drugs in his truck and was held for twenty minutes pending the arrival of a DEA agent had not been unreasonably detained:

"While it is clear that 'the brevity of the invasion of
the individual's Fourth Amendment interests is an
important factor in determining whether the seizure is so
minimally intrusive as to be justifiable on reasonable
suspicion,' we have emphasized the need to consider the

---

[8]     *Morales-Zamora* had held that a canine sniff of defendants'
vehicle at a roadblock checkpoint was not an unreasonable
detention because agents completed the canine sniff before
another agent had finished examining the driver's license and
registration.

law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." 105 S.Ct. at 1575 (quoting *United States v. Place*, 103 S.Ct. 2637, 2645 (1983)).

In this case, the law enforcement interest to be served by running a computer check on the license of someone stopped for a traffic violation is unquestioned. It is also clear that the time it took for Officers LaChance and Froman to run the check imposed no significant Fourth Amendment hardship. Officer LaChance testified that, depending upon the number of checks being requested of the lone teletype operator, a computer check can take anywhere from two to three to ten to fifteen minutes. He also testified that in this instance only about four minutes elapsed from the time that the car was stopped to the time Parker gave consent.

The district court found "that the period of detention by the officers was not beyond the scope of the initial purpose for the stop, which was speeding" and "this detention did not go beyond that purpose." He implicitly credited the testimony of the officers that the questioning and consent to search took place while the officers were awaiting the results of the computer check and that this process lasted only about four minutes. These findings are supported by the evidence and are not clearly erroneous. Based upon these facts, we cannot say that the period of appellants' detention was either unreasonably lengthy or extended beyond the period justified by the valid speeding stop.

## B.

We now turn to the issue of the validity of the consent to search. The standards governing the judicial assessment of the

voluntariness of a tendered consent were described in *Kelley*, 981

F.2d at 1470 as follows:

> "'To be valid, consent to search must be free and voluntary.' *United States v. Olivier-Becerril*, 861 F.2d 424, 425 (5th Cir. 1988). The government has the burden of proving, by a preponderance of the evidence, that the consent was voluntary. *United States v. Yeagin*, 927 F.2d 798, 800 (5th Cir. 1991). Where consent is preceded by a Fourth Amendment violation, the government has a heavier burden of proving consent. *United States v. Ruigomez*, 702 F.2d 61, 65 (5th Cir. 1983). The voluntariness of consent is 'a question of fact to be determined from the totality of all the circumstances.' *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973). We will not reverse the district court's finding that consent was voluntary unless it is clearly erroneous. *Olivier-Becerril*, 861 F.2d at 425-26. 'Where the judge bases a finding of consent on the oral testimony at a suppression hearing, the clearly erroneous standard is particularly strong since the judge had the opportunity to observe the demeanor of the witnesses.' *United States v. Sutton*, 850 F.2d 1083, 1086 (5th Cir. 1988)."

In evaluating the voluntariness of a consent, this Court has

looked to six factors:

> "(1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found." *Olivier-Becerril*, 861 F.2d at 426 (citations omitted).

Although all six factors are relevant, no single factor is

dispositive. *See id*.

The district court made specific findings concerning all six

of these factors, expressly recognizing that the government had the

burden to show voluntary consent by a preponderance of the

evidence. As to the first factor, voluntariness of custodial

status, the court found that the defendants "were not free to leave

13

until the officers finished their check of the driver's license or vehicle tag . . . they were checking on the radio," and that this "militate[d] against the government."  Concerning the defendant's awareness of his right to refuse consent, the fourth factor, this also "militate[d] against the government" to the extent that "Parker apparently was not specifically told by Officer LaChance that he had a right to refuse to consent"; however, the court also found in this connection that the officers gave Parker a written consent form to read, that "[t]he form itself informs Mr. Parker of his right to refuse consent,"[9] that there was no evidence Parker "didn't read it" and that he was "a high school graduate and presumably can read."  As to each of the remaining four factors, the court found for the government, finding "there was not the presence of coercive police procedures here," that "defendants cooperated fully," that Parker "has a high school education," and that "Parker believed no incriminating evidence would be found." While there was conflicting evidence on some of these factors, there is evidence to adequately support each of the district court's findings, and the findings are not clearly erroneous. After making the foregoing findings, the district court ultimately found "that the consent to search was given voluntarily by Mr.

---

[9]    The form, which Parker signed, stated:

"I understand I have the right to refuse consent to the search described above and to refuse to sign this form. I further state no promises, threats, force, or physical or mental coercion of any kind whatsoever have been used against me."

Parker also orally consented to the search.

14

Parker without coercion."

Based on the district court's specific findings as to each of the six factors, and considering the evidence as a whole, we cannot say that the district court's ultimate finding, that Parker voluntarily and without coercion consented to the search, was clearly erroneous or influenced by an incorrect view of the law.[10]

Appellants have failed to demonstrate that the district court erred by denying their motion to suppress.[11]

---

[10] We have held that the district court did not err in its determination that the detention was valid and did not extend beyond the period justified by the valid speeding stop. Nevertheless, we observe that the district court also found that "even if this detention went beyond that period necessitated by the speeding stop, the consent validated the search." This determination by the district court, while not necessary to its decision or ours, appears to be valid under our holding in *Kelley*, where we applied "the *Brown* [*v. Illinois*, 95 S.Ct. 2254 (1975)] factors" and sustained the district court's determination that the consent, even if given during a period of illegal detention, was voluntary *and* validated the search. *Kelley* at 1471-72. In this respect, *Kelley* is not distinguishable from the present case. Also supporting *Kelley*'s holding in this respect are *Walker*, 933 F.2d at 817-18; *Guzman*, 864 F.2d at 1520-21; *United States v. Varona-Algos*, 819 F.2d 81, 82-83 (5th Cir.), *cert. denied*, 108 S.Ct. 298 (1987); *United States v. Ruigomez*, 702 F.2d 61, 65 (5th Cir. 1983); *United States v. Ballard*, 573 F.2d 913, 916 (5th Cir. 1978). *But see United States v. Melendez-Gonzalez*, 727 F.2d 407, 413-14 (5th Cir. 1984).

[11] Our analysis assumes, *arguendo only*, that decisions such as *United States v. Robinson*, 94 S.Ct. 467, 477 (1973); *Gustafson v. Florida*, 94 S.Ct. 488 (1973); *New York v. Belton*, 101 S.Ct. 2860 (1981); and *United States v. Ross*, 102 S.Ct. 2157 (1982), do not apply where, at the time of the alleged Fourth Amendment violation following a lawful stop for a traffic violation, there has not been "a full-custody arrest" but instead merely "'a routine traffic stop' . . . where the officer would simply issue a notice of violation and allow the offender to proceed." *Robinson*, 94 S.Ct. at 477 n.6. The Supreme Court seems to have expressly left this open. *Id. Cf. United States v. Parr*, 843 F.2d 1228 (9th Cir. 1988). We need not reach this issue because here the brief continued detention following the lawful traffic stop was valid under *Terry* and the search was pursuant to valid, voluntary consent.

II.  The "Mere Presence" Instruction

Appellants argue that the trial court erred by failing to give the jury a "mere presence" chargeSQi.e., an instruction that one's presence in the area where drugs are found or association with the person actually in control of the drugs, is insufficient to support a finding of possession.  Although such an instruction is abstractly an accurate statement of the law, *see United States v. Stephenson*, 474 F.2d 1353, 1355 (5th Cir. 1973), it does not follow that the failure to so instruct was reversible error.[12]  Appellants rely upon *United States v. Cordova-Larios*, 907 F.2d 40 (5th Cir. 1990), in which we reversed a conviction for failure to submit a

---

[12]  At the charge conference defense counsel stated "I want to make sure that the Court's definition of 'possession' includes the fact that the mere presence alone is not sufficient, that mere presence alone is not sufficient to convict the defendants." The court inquired if counsel were "objecting to the definition of 'possession,'" and counsel replied "insofar as it does not include a statement as to the mere presence, it does not in itself prove up possession and would not enableSQenable the jury to convict the defendants just because they were present."  The court responded "I don't think the charge permits them to convict either defendant simply because they were present . . . . they have to find possession.  'Possession' is defined here."  Later, defense counsel argued that "the proper precautionary instruction that mere presence aloneSQby not placing it in there, you're lessening the government's burden of proof," and objected "to the Court's failing to instruct the jury on 'mere presence' because we feel that the foundation of the case warrants it and that's the whole thrust of the case.  By failing to include it, it amounts to a comment on the weight of the evidence by the Court and it denies the effective assistance of counsel because we will not be able to argue it effectively . . . ."  The defense never tenderedSQorally or in writingSQthe "mere presence" instruction they desired.  We assume, *arguendo*, that the objections were adequate so that we may properly treat the case as if an instruction had been requested (and objection made to the refusal to give it) that "mere presence in the area where the narcotic is discovered or mere association with the person who does control the drug or the property where it is located, is insufficient to support a finding of possession."  *Stephenson* at 1355.

16

mere presence instruction. However, in the present case no reversible error is presented. First, it is well-established that the refusal to submit a requested jury instruction is not reversible error if the instruction was substantially covered in the charge as given.[13] In this case, the trial court's instructions to the jury as to possession were sufficient to prevent a conviction (or a finding of possession) based upon mere presence.[14] Therefore appellants' mere presence instruction was substantially reflected in the charge as given. In *United States v. McKnight*,

---

[13] It is settled law that this Court will reverse the refusal to give a requested jury instruction only if that instruction

"(1) was substantially correct; (2) was not substantially covered in the charge delivered to the jury; and (3) concerned an important issue so that the failure to give it seriously impaired the defendant's ability to present a given defense." *United States v. Duncan*, 919 F.2d 981, 990 (5th Cir. 1990), *cert. denied*, 111 S.Ct. 2036 (1991).

[14] The trial court instructed the jury as follows:

"Possession, as that term is used in this case, may be of two kinds: actual possession and constructive possession. A person who *knowingly* has direct physical control over a thing, at a given time, is then in actual possession of it.
A person who, although not in actual possession, *knowingly* has *both* the *power* and the *intention*, at a given time, to exercise dominion or control over a thing, either directly or through another person or persons, is then in constructive possession of it.
Possession may be sole or joint. If one person alone has actual or constructive possession of a thing, possession is sole. If two or more persons share actual or constructive possession of a thing, possession is joint.
You may find that the element of possession, as that term is used in these instructions, is present if you find beyond a reasonable doubt that the defendant had actual or constructive possession, either alone or jointly with others." (Emphasis added).

953 F.2d 898 (5th Cir.), *cert. denied*, 112 S.Ct. 2975 (1992), defendants similarly complained of the trial court's refusal to submit a mere presence instruction. We held, however, that the court's constructive possession chargeSQwhich was identical to the charge delivered in this caseSQobviated the need for a separate mere presence charge. We relied in *McKnight* in part upon *United States v. Erwin*, 602 F.2d 1183, 1185 (5th Cir. 1979), *cert. denied*, 100 S.Ct. 1014 (1980), and *United States v. Rojas*, 537 F.2d 216, 200 (5th Cir. 1976), *cert. denied*, 97 S.Ct. 785 (1977), cases in which we had reached the same conclusion. There is no indication that a constructive possession charge was submitted to the jury in *Cordova-Larios*, a fact which *McKnight* observed. "There is no conflict, therefore, between the holdings of *Cordova-Larios* and *Rojas*." *McKnight*, 953 F.2d at 904.

*McKnight* also affords a second basis for rejecting appellants' assignment of error. "McKnight's claim fails," we said, "because this case, unlike *Cordova-Larios*, is, by its undisputed facts, not a '*mere* presence' case." 953 F.2d at 903 (emphasis in original). In *McKnight*, drugs and firearms were discovered in McKnight's small, one-bedroom house where he lived with his 84-year-old mother and a boarder. McKnight's theory of defense was that though present he was unaware of the contraband. We stated that these circumstances did not lend themselves, as a legal matter, to a mere presence defense:

> "The dominion and control associated with owning *and* living in a small, open house like McKnight's . . . is utterly inconsistent with the legal conclusion that McKnight was '*merely* present' in a house full of guns and drugs in its common areas (and a gun in the dresser used

18

by McKnight)." *Id.* at 903 (emphasis in original). By contrast, the facts of *Cordova-Larios*, which we recount in the margin, are far more amenable to such a defense than are the facts of *McKnight*.[15]  As we said, "The record sufficiently supports the defensive theory of mere presence to entitle the defendant to the requested instruction."  *Cordova-Larios*, 907 F.2d at 42.

We believe that this case is closer to *McKnight* than to *Cordova-Larios*.  There is no evidence that appellants were mere bystanders who happened to be at the scene of a crime, as in *Cordova-Larios*.  Quite the contrary, as in *McKnight*, the drugs were indisputably discovered in a location the control over which cannot be fairly attributed to anyone but appellants.  Accordingly, it was not error to refuse the mere presence instruction.

III.  The Sufficiency of the Evidence

Appellants' final challenge is to the sufficiency of the evidence.  We will sustain the convictions if a rational jury could have found as to each appellant that each of the elements of the offense was established beyond a reasonable doubt.  *See Jackson v. Virginia;* 99 S.Ct. 2781, 2788-89 (1979); *United States v. Bell*, 678 F.2d 547, 549 (5th Cir.1982) (en banc), *aff'd*, 103 S.Ct. 2398

---

[15]    In *Cordova-Larios*, the defendant was a passenger in a truck owned his brother-in-law and driven by a man named Saenz who the two had met only the previous day.  The brother-in-law had loaned the truck to Saenz, not the defendant, for Saenz to travel from Juarez, Mexico to Albuquerque, New Mexico. The defendant came along with the intention of buying goods.  Border patrol agents gave chase after Saenz stopped the truck on a road by the Rio Grande and someone who had been hiding in bushes placed several bundles of marihuana in the bed of the truck.  During the chase, the defendant fell out of the truck.  The defendant testified that he had attempted to wrest control of the truck from Saenz but the latter had pushed him out of the passenger door.

(1983).  The evidence will be viewed in the light most favorable to the government.  *See Glasser v. United States*, 62 S.Ct. 457 (1942).  A conviction for possession of drugs with intent to distribute, a violation of 21 U.S.C. § 841(a)(1), requires the government to prove that the defendants knowingly possessed contraband with the intent to distribute it.  *See, e.g., United States v. Richardson*, 848 F.2d 509, 511 (5th Cir.1988).  Here, appellants challenge only the knowing possession requirement.[16]  We hold that the evidence suffices to support the jury's conclusion that appellants knowingly possessed the drugs.

## A.  Possession

Possession, as noted previously, may be actual or constructive.  Ownership, dominion, or control over the contraband, or over the vehicle in which it was concealed, constitutes constructive possession.  Here, Shabazz was driving, and Parker was riding in, the car in which the cocaine was discovered.  Parker represented that he owned the vehicle.  The two were traveling together, and had been together in Houston for several days.  Accordingly, the jury could easily have found that appellants were in constructive possession of the cocaine.

## B.  Knowing

We have said that, "Knowledge of the presence of contraband may ordinarily be inferred from the exercise of control over the vehicle in which it is concealed."  *United States v. Garcia*, 917 F.2d 1370, 1376-77 (5th Cir.1990).  In a number of recent cases, we have added that, if the illegal substance is contained in a hidden

---

[16]    Appellants stipulated that, if the government proves knowing possession, they would concede intent to distribute.

compartment in the vehicle, we may also require circumstantial evidence that is suspicious in nature or demonstrates guilty knowledge. *See, e.g., United States v. Pineda-Ortuno*, 952 F.2d 98, 102 (5th Cir.1992), *cert. denied*, 112 S.Ct. 1990 (1992); *United States v. Gonzalez-Lira*, 936 F.2d 184, 192 (5th Cir.1991); *United States v. Diaz-Carreon*, 915 F.2d 951, 954-55 (5th Cir.1990); *United States v. Anchondo-Sandoval*, 910 F.2d 1234, 1236 (5th Cir.1990). Here, there was additional circumstantial evidence from which the jury could have found that appellants' possession of the cocaine was knowing. Appellants gave inconsistent accounts of their stay in Houston, were nervous, and became anxious as Officer LaChance began to search the side of the car where the drugs were found. Shabazz, the driver, gave the officers a false driver's license. Similar evidence has been deemed sufficient to support convictions in previous cases. *See Pineda-Ortuno*, 952 F.2d at 102 (nervousness, conflicting statements, and implausible story); *Diaz-Carreon*, 915 F.2d at 954-55 (same); *Anchondo-Sandoval*, 910 F.2d at 1237 (inconsistent story); *United States v. McDonald*, 905 F.2d 871, 874 (5th Cir.), *cert. denied*, 111 S.Ct. 566 (1990) (nervousness, inconsistent stories, heightened anxiety when search was getting warmer). Furthermore, a screwdriver was lying on the front floorboard of the driver's side of the car and there were fresh nicks on the screws of the front air conditioning duct on the driver's side from which the cocaine readily tumbled out when the screws were loosened. The jury could properly have inferred that the cocaine had been concealed only recently, thus implicating the car's latest occupants. No defense evidence was presented.

## Conclusion

For the reasons stated herein, appellants' convictions are

AFFIRMED.