**UNITED STATES of America, Plaintiff,**

v.

**April D. SHARPE, Defendant.**

**No. 93–40045–02–SAC.**

United States District Court,
D. Kansas.

Feb. 18, 1994.

Joseph D. Johnson, Joseph D. Johnson, Chtd., Topeka, KS, for Maurice Edward Hurse.

Marilyn M. Trubey, Office of Federal Public Defender, Topeka, KS, for April D. Sharpe.

## MEMORANDUM AND ORDER

CROW, District Judge.

The case comes before the court on the defendant's motion to suppress (Dk. 30) all items seized during a traffic stop on September 15, 1993. The defendant argues the evidence seized is fruit of an illegal detention.

---

On February 18, 1994, the court heard the testimony of the Kansas Highway Patrol Trooper, viewed the videotape of the incident recorded by the Trooper's video camera, and listened to counsel's arguments. The court is ready to rule.

On September 15, 1993, around 8:15 a.m., Kansas Highway Patrol Trooper Jim Brockman was on patrol on the Kansas Turnpike between Emporia and Wichita traveling south. He observed an oncoming pale yellow Olds Cutlass cross the center line and travel at a rate in excess of the speed limit. He triggered his radar device which indicated that the northbound car was traveling approximately 83 miles per hour in a 65 mile per hour speed zone. Trooper Brockman turned around in the southbound lane and headed north in this lane with his emergency lights activated until he reached the median opening. As he began the pursuit in the southbound lane, the officer lost sight of Olds Cutlass as it had crested the hill. When he reached the top of the hill, Trooper Brockman was surprised to see that the Olds Cutlass had already parked on the shoulder. He thought that the timing and location of the stop was very unusual and was cause to suspect that the occupants had either switched drivers or were hiding something while the car was stopped on the reverse slope. During the time that he stopped behind it and made radio contact with dispatch, the Trooper did not see either the driver or the passenger look behind at him. Brockman thought this behavior too was unusual, but he could not rule out the possibility that the driver was watching him through the mirrors.

Trooper Brockman approached the Cutlass and spoke to the driver. The Trooper advised that he stopped the car for driving on the center line and for speeding. He asked for and received the driver's licenses from both the driver and the passenger. The driver was identified as Maurice Hurse and the passenger as April Sharpe. Trooper Brockman asked who owned the car and learning it was Sharpe's car he requested her to produce the car registration and proof of insurance. During this conversation, Trooper Brockman observed a pine tree air freshener hanging from the rear view mirror and another air freshener laying in the area beneath the ashtray. Trooper Brockman testified that the odor of air fresheners coming from the car was "overpowering."

Trooper Brockman returned to his patrol car to issue the citation and warning. He also ran a driver's license check on Hurse and NCIC and Kansas City Missouri Police Active File checks on both Hurse and Sharpe. He learned that there were no outstanding warrants but that Maurice Hurse had a recent drug arrest in Kansas City, Missouri.

Trooper Brockman went back to the Cutlass and asked Hurse to step to the rear of the car. The Trooper returned the driver's license to Hurse who, in turn, gave the Trooper the proof of insurance on the car. While reviewing the proof of insurance, Trooper Brockman asked Hurse where they were coming from. Hurse said Wichita. While explaining the ticket, the significance of Hurse's signature, and the payment procedure, Trooper Brockman asked Hurse why he stopped the car where he did. Hurse answered that he was speeding and that he realized the Trooper had seen him so he stopped. As he handed the ticket to Hurse, Trooper Brockman asked if Hurse was carrying anything illegal in the car, and Hurse said no. The Trooper then asked about Hurse's prior drug arrest. Hurse replied that it had been for cocaine and marijuana and that it had occurred last year. Trooper Brockman then inquired if he was carrying any drugs now, and Hurse again answered no.

Trooper Brockman requested Hurse to stay there just a minute while he returned the driver's license and warning ticket to April Sharpe. After handing Sharpe her license and warning ticket, Trooper Brockman explained the warning and asked where they were coming from. She answered Oklahoma. The Trooper then asked Sharpe why Hurse stopped at this particular location. Sharpe said that Hurse knew he was speeding and pulled over when he saw the patrol car. The Trooper next inquired if she was carrying anything illegal or narcotics in the car, and Sharpe said no. The Trooper then

said: "At this point, you are both free to go, however, if you don't mind, seems as how it is your vehicle, I would like to look through you vehicle, if you don't mind." Sharpe answered that would be "o.k." Trooper Brockman requested Sharpe to stay in the car.

Trooper Brockman went back to where Hurse was standing and again asked him where they were coming from. Hurse repeated his answer of Wichita and explained that they had spent the night there. The Trooper asked Hurse where they had been before Wichita, and Hurse said Kansas City. Trooper Brockman then advised Hurse that he was free to leave but that Sharpe had given her consent to search the car. The Trooper asked Hurse if he had any weapons on him, and pointed at something on Hurse's waist. Hurse said it was a beeper. Trooper Brockman then asked for Hurse's occupation, and Hurse said he worked for a painting company and just carried the beeper. The Trooper directed Hurse to stand beside the front bumper of the patrol car while he searched the Cutlass.

Trooper Brockman returned to the Cutlass and asked Sharpe how long they had been driving, where they had been, and why they were in Oklahoma. He next asked if there were any weapons in the vehicle. Sharpe said that in the glove compartment was a handgun that she owned. Brockman retrieved from the glove compartment a fully-loaded handgun with the safety selector on fire and a round in the chamber. Trooper Brockman placed the gun in the patrol car, and then searched Hurse for weapons after asking Hurse for his consent. Trooper Brockman eventually searched the car finding 170 grams of crack cocaine. The elapsed time between the traffic stop and the consent to search was approximately fifteen minutes.

■ The defendant argues that once she and Hurse provided valid driver's licenses and proof of vehicle ownership Trooper Brockman was without cause to further question them about where they were coming from or whether there were drugs or contraband in the car. According to the defendant, Trooper Brockman lacked reasonable articulable suspicion to detain them with these questions unrelated to the traffic stop. The defendant also refutes that Trooper Brockman's questions of her after returning her license and citation were consensual because her companion was still standing outside at the Trooper's direction. The defendant limits her written argument to whether she was lawfully detained.

"Evidence seized in a search conducted during an illegal detention must be suppressed unless there is sufficient attenuation between the detention and the consent to search." *United States v. Turner,* 928 F.2d 956, 958 (10th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 230, 116 L.Ed.2d 187 (1991). A routine traffic stop is a limited seizure akin to an investigative detention under *Terry. See Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 3149, 82 L.Ed.2d 317 (1984). The judicial inquiry borrowed from *Terry* "is a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio,* 392 U.S. 1, 19, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). This dual inquiry is an objective analysis of the facts and circumstances. *United States v. Pena,* 920 F.2d 1509, 1514 (10th Cir.1990), *cert. denied,* 501 U.S. 1207, 111 S.Ct. 2802, 115 L.Ed.2d 975 (1991). In this case, the defendant might argue either the initial traffic stop or the subsequent questioning about their point of departure and the presence of drugs and weapons was an illegal detention.

"A traffic stop is an investigative detention analogous to a *Terry* stop, in that, although probable cause is not required, the detaining officer must have an objectively reasonable articulable suspicion that a traffic violation has occurred or is occurring before stopping the automobile." *United States v. Soto,* 988 F.2d 1548, 1554 (10th Cir.1993) (citation omitted). Because the defendant does not claim that the traffic stop was pretextual, the court makes only a cursory inquiry. A radar reading of eighty-two miles per hour in a sixty-five miles per hour zone is reasonable suspicion that a violation has occurred. There is no evidence that the traffic stop was pretex-

tual.[1] "Absent introduction of any rationale for the stop outside the parameters of the traffic violations, the stop cannot, by definition, be called 'pretextual.'" *United States v. Horn*, 970 F.2d 728, 731 (10th Cir.1992). The initial traffic stop was lawful under Fourth Amendment principles.

The defendant does argue that the officer's inquiry about where they were coming from and whether there was contraband in the car was an illegal detention because the officer lacked reasonable articulable suspicion for the questions. The officer making a routine traffic stop may request a driver's license and vehicle registration, run a computer check on the car and driver, and issue a citation. *United States v. Soto*, 988 F.2d 1548, 1555 (10th Cir.1993). "Once the driver has produced a valid license and proof that he is entitled to operate the car, 'he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning.'" *United States v. Walker*, 933 F.2d 812, 816 (10th Cir.1991) (quoting *United States v. Guzman*, 864 F.2d 1512, 1519 (10th Cir.1988)), *cert. denied*, — U.S. ——, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992).

■ Delay or detention[2] caused by questioning unrelated to the initial stop is justified in two circumstances. *United States v. Gonzalez–Lerma*, 14 F.3d 1479, 1483 (10th Cir.1994). One is where the officer asks the questions on the basis of " 'objectively reasonable articulable suspicion' of illegal activity." *United States v. Sanchez–Valderuten*, 11 F.3d 985, 989 (10th Cir.1993) (quoting *United States v. Soto*, 988 F.2d at 1554). The other is where the original detention has ended and the questioning is conducted during a consensual encounter. *United States v. McKneely*, 6 F.3d 1447, 1450–51 (10th Cir.1993). The government insists both circumstances justify the questioning here.

The determination whether objectively reasonable suspicion of illegal activity existed "does not depend upon any one factor, but on the totality of the circumstances." *United States v. Soto*, 988 F.2d at 1555 (citations omitted). " 'Police officers need not close their eyes to suspicious circumstances.'" *United States v. Pena*, 920 F.2d at 1514 (quoting *United States v. Espinosa*, 782 F.2d 888, 891 (10th Cir.1986)). Officers are allowed "to graduate their responses to the demands of any particular situation." *United States v. Place*, 462 U.S. 696, 709 n. 10, 103 S.Ct. 2637, 2646 n. 10, 77 L.Ed.2d 110 (1983).

The Tenth Circuit has found in a variety of circumstances that an officer has had objectively reasonable suspicion to ask[3] whether

---

**1.** A defendant challenging a search or seizure on the ground that government's justification was pretextual has the burden of proving the pretextual nature of the exception to the warrant requirement. *United States v. Maestas*, 2 F.3d 1485, 1491–92 (10th Cir.1993).

**2.** An officer asking a question, even if unrelated to the stop, does not by itself amount to a Fourth Amendment violation. *United States v. Shabazz*, 993 F.2d 431, 436 (5th Cir.1993). Questioning is not a seizure. *Florida v. Bostick*, 501 U.S. 429, ——, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389, 398 (1991). The second inquiry under *Terry* focuses on the lawful duration of the original detention. A valid initial stop can become unreasonable at some point. *United States v. Rivera*, 867 F.2d 1261, 1263 (10th Cir.1989). "In a garden variety *Terry* stop, the nature of the questioning during a later portion of the detention may indicate that the justification for the original detention no longer supports its continuation." *Shabazz*, 993 F.2d at 436. If the questioning does not extend the duration of the original detention, there is no Fourth Amendment violation. *Id.* Consequently, questions asked while waiting for computer check results or completing necessary paperwork

do not delay the stop beyond the time necessary to issue a citation. *See, e.g., Shabazz*, 993 F.2d at 437; *United States v. Walker*, 933 F.2d 812, 816 n. 2 (10th Cir.1991); *United States v. Morales–Zamora*, 914 F.2d 200, 203 (10th Cir.1990); *United States v. Torres*, No. 92–4061, unpub. op., 1993 WL 330616, 1993 U.S.App. LEXIS 22380 (10th Cir. Sept. 1, 1993).

**3.** The defendant also contends the officer must have reasonable suspicion of illegal activity before asking the defendant about where she is coming from or going to. The court in *Guzman* did refer to the inquiry into destination as one of the many intrusive questions that unlawfully detained the defendants. 864 F.2d at 1514. Since *Guzman* the Tenth Circuit has not singled out such a question as constituting an unlawful detention if asked as part of the officer's graduated response to suspicious circumstances presented during the traffic stop. *See, e.g., United States v. Sanchez–Valderuten*, 11 F.3d 985, 987 (10th Cir. 1993) (Officer asked about travel plans after detecting the odors of air freshener and coffee and after learning that the defendant had a driver's license from New York and a registration from

the stopped vehicle contains drugs or contraband. *See, e.g., United States v. Sanchez-Valderuten,* 11 F.3d 985 (10th Cir.1993) (Heavy odor of masking agents, coffee and air freshener; evasive answer to question about where coming from; and unusual route for stated destination); *United States v. Soto,* 988 F.2d 1548 (10th Cir.1993) (Nervous appearance and unable to provide address of alleged uncle who was claimed to own the car); *United States v. Horn,* 970 F.2d 728 (10th Cir.1992) ("[U]nusual and provocative manner" of stopping car on highway and "suspicious-looking ownership documents"); *United States v. Turner,* 928 F.2d 956 (10th Cir.1991) (Nervous appearance and stated occupation of auto mechanic was not consistent with dress, well-manicured hands and expensive collection of compact discs); *United States v. Arango,* 912 F.2d 441, 447 (10th Cir.1990) (Inability to provide proof of lawful possession and inadequate luggage for a vacation trip).

The totality of circumstances supports a reasonable suspicion of illegal activity. Trooper Brockman observed that the Olds Cutlass provocatively stopped out of his immediate vision. Trooper Brockman was suspicious that while the car was stopped on the reverse slope of the hill the occupants either switched drivers or were taking other measures to hide or discard contraband. As he pulled behind the stopped car, Trooper Brockman did not see either of the occupants look back at him. In the Trooper's experience, this was unusual conduct. While talking with the Hurse and Sharpe, Trooper Brockman smelled the strong odor of air freshener coming from the car. From his training and experience, the Trooper knew that air fresheners are often used as masking agents by those transporting controlled substances. Trooper Brockman testified that his experience and training also has made him aware that the Kansas Turnpike is a

route frequently used by those trafficking in drugs. Through the Kansas City Missouri Police Active File check, Trooper Brockman learned that Hurse recently had been arrested for a drug related offense. At this point, Trooper Brockman had reasonable suspicion of illegal activity afoot to ask questions unrelated to the original traffic stop and to graduate his inquiry and response to the circumstances unfolding before him.

Trooper Brockman asked Hurse about the prior drug arrest and where they were traveling from. After learning the arrest was for cocaine and marijuana and that they were coming from Wichita, Trooper Brockman asked Hurse to remain at the rear of the car while he gave Sharpe her warning on the seat belt violation. Trooper Brockman returned the driver's license and presented the warning ticket to Sharpe. Still having reasonable suspicion of illegal activity, Trooper Brockman asked Sharpe where they were coming from, and she responded Oklahoma. Brockman also asked Sharpe whether she was carrying drugs or contraband. Brockman advised Sharpe that they could leave but asked if he could look through the car for drugs or other contraband. Sharpe said she had no objection to the Trooper's request to search the car. The court finds that Trooper Brockman had objective reasonable suspicion of illegal activity to extend the defendant's detention with further questions. Consequently, the defendant was not illegally detained when she consented to the search of the car. In light of this finding, the court believes it unnecessary to consider the alternative ground of consensual encounter.

The defendant only argues that her subsequent consensual search was tainted by an illegal detention. Though it seems the defendant may be conceding that the consent was voluntary, the court will still address this issue. "[A] search may be conducted without

Washington); *United States v. Turner,* 928 F.2d 956, 958 (10th Cir.1991) (Officer asked about destination and occupation after learning that car was not registered to any one in the car and after observing that the defendant appeared nervous). Questions about travel itinerary and the purpose of the trip also may be permitted if reasonably related to the purpose of the traffic stop. *See, e.g., United States v. Barahona,* 990

F.2d 412, 416 (8th Cir.1993). In the instant case, the court believes Trooper Brockman's questions about where the defendants were coming from were a proper part of his graduated response to suspicious circumstances. At that point, Trooper Brockman had observed provocative stopping of the car, smelled a strong odor of air freshener coming from the car, and learned of Hurse's recent drug arrest.

probable cause and without a warrant if the search is conducted pursuant to voluntary consent." *United States v. Guglielmo*, 834 F.2d 866, 868 (10th Cir.1987) (citations omitted). Before evidence from such a search is admitted, the court must find that the consent to search was voluntary and that the search did not exceed the scope of the consent. *United States v. Price*, 925 F.2d 1268, 1270 (10th Cir.1991).

Voluntariness of consent is a question of fact determined from the totality of the circumstances with the burden of proof resting on the government. *Id.* at 1271. "[T]he government must: (a) present 'clear and positive testimony that consent was unequivocal and specific and freely given'; and (b) 'prove consent was given without duress or coercion, express or implied.'" *United States v. McKneely*, 6 F.3d at 1453 (quoting *United States v. Butler* 966 F.2d 559, 562 (10th Cir.1992) (citation omitted)). "Valid consent may be given by a person being detained." *United States v. Soto*, 988 F.2d at 1557 (citations omitted).

There is no evidence of overt coercion by Trooper Brockman. He was the only officer present and he did not have his gun drawn, did not use an insisting or demanding tone or manner, did not physically harass the defendants, and did not use any threats or promises. He asked for consent only after telling Sharpe that she and her companion were free to leave. The entire incident occurred on the shoulder of a public turnpike highway. The Trooper's testimony that Sharpe voluntarily consented to the search is uncontroverted. The Trooper's search at all times was within the scope of the Sharpe's consent.

IT IS THEREFORE ORDERED that the defendant's motion to suppress (Dk. 30) is denied.