In this case, Bruce Forrester appeals from the trial court's denial of a motion to suppress evidence. After the denial of the suppression motion, Forrester pled no contest to two counts of trafficking in marijuana and one count of possession of criminal tools. The court then found Forrester guilty, but merged the two counts of trafficking. Ultimately, Forrester was sentenced to a definite term of one year in the Department of Rehabilitation and Correction on each of the three counts, with the sentences to be served concurrently. However, the court also suspended the sentences and imposed five years probation.
On appeal, Forrester raises the following single assignment of error:
 The trial court erred in failing to suppress evidence seized as the fruits of a warrantless search in which consent was involuntary, or in the alternative, erred in failing to find that the search exceeded the scope of any involuntary consent.
Upon consideration of the assignment of error, we find the judgment of the trial court should be reversed and remanded for further consideration. In addition, the trial court erred in failing to account for the merger of counts I and II in sentencing. As a result, if the suppression motion is again overruled after reconsideration, the trial court should take the merger into account in re-sentencing. Our analysis of these matters is set forth below.
 I
The pertinent facts surrounding the search are as follows. On July 27, 1995, the Greene County Drug Task Force, along with the National Guard, Greene County Sheriff's Department, and the BCI, were involved in "marijuana eradication." In this process, helicopters are used to identify marijuana growing in rural and city areas of the county. At the time, Bruce and Susan Forrester lived at 561 Krepps Road with their young daughter, Katie. Susan was also three months pregnant with a second child. Before the eradication took place, the police had not focused on either the Krepps Road property or the Forresters as potential subjects of any investigation. The property itself consisted of a house, barn, chicken coop, and approximately 40 acres of land.
While flying over the Krepps Road property, officers in a National Guard helicopter spotted marijuana growing in a field. Normally, ground troops are notified when marijuana is spotted. If the marijuana is within the curtilage, they knock and get permission or obtain a search warrant. If the marijuana is not within the curtilage, they simply go and get the marijuana. In this case, Detective Polston, of the Beavercreek Police Department, and Deputy Smith, of the Greene County Sheriff's Department, were in contact with the National Guard helicopter and were directed to the Krepps Road property. Although Polston and Smith did not testify at the suppression hearing, Detective Jones, from the Central State Police Department, did testify.
According to Jones, he came to the Krepps Road property about a half hour after Polston and Smith arrived. Jones was the officer in charge. When Jones arrived, he was told that written permission to search had already been obtained from a resident of the property. Upon arriving, Detective Jones walked to the back area of the farm, where plants were growing in a field. Additionally, Jones observed marijuana plants in small pots, outside, at the side of a chicken coop. Jones took pictures of the plants in the field, of the plants by the chicken coop, and of a growing area set up inside the chicken coop.
On the day of the search, only Susan and Katie Forrester were at home. Susan was in the first trimester of a high-risk pregnancy, caused by her age (42) and by having lost two babies during the first trimester several years earlier. Her pregnancy was quite difficult, with almost constant morning sickness, fatigue, and problems dealing with heat. While in the house, Susan noticed a helicopter outside and took her daughter out to wave at it. Within fifteen minutes, two officers knocked on the door and told her that marijuana had been spotted in the cornfield. The officers asked if they could go out and retrieve the marijuana. At that point, Susan looked out and saw people already in the field. She then gave the officers permission to retrieve the marijuana and went outside with them. While outside, she felt stunned by what was happening and was also physically ill because of the heat.
Susan testified that an officer approached her and told her he had papers for her to sign. Although the officer was motioning her to a car, Susan asked to go inside and sit down because she felt ill. About six or seven people accompanied her inside. Some were dressed in uniforms and they all had guns. When the papers were handed to Susan, she asked about being entitled to a search warrant. The officer with the papers commented in response as follows:
 Listen, we got all of these officers out here and they are on a schedule. They're not going to like it if you tell us to go get a search warrant. Sure, we can send somebody to go up and come back, but we're not going to do that. For your own good, you'd better sign this now or things could get a little rough."
Susan was unsure what the officer meant by "things getting a little rough." She testified that she was afraid the officers might physically harm her or throw her up against the wall. Furthermore, in view of her past problem pregnancies, she was aware of what stress could do to the life of an unborn child. As a result of her concern for the safety of her unborn child, she signed the consent papers.
Susan also testified that she was not initially threatened with violence and that the officers who came to her door were polite. Her conversation with the officers outside was normal, focusing on things like the heat. She further said she read and understood the forms she signed, and commented that when she signed the forms, she wanted to do the right thing.
Detective Jones, who arrived after the search form had been signed, offered essentially irrelevant testimony. According to Jones, Susan was distraught and out of control off and on. At times, she burst into tears and made comments to the effect that "she didn't deserve this." The focus of Susan's distress and frustration was not the police, but was her husband. Specifically, Susan was upset with her husband because he was engaging in a marijuana-growing operation. Detective Jones also indicated that the police tried to keep Susan as calm as they could, knowing she was pregnant. However, this testimony involved events occurring after consent had been obtained, and carries no weight.
Susan testified at the hearing that she had received a bachelors degree in fine arts from Miami University, and had achieved academic distinction in college, including a full scholarship to study abroad during part of her junior year. The forms themselves included a pre-interview form and a permission to search form. The pre-interview form explains standard rights such as the right to remain silent and the right to counsel. Susan initialed each statement on this form to indicate that she had read and understood the statement. The permission to search form authorized the police to make a complete search of the premises at Krepps Road and to take from the premises any letters, papers, material, or other property the police desired. This form also indicated that Susan had the right to refuse to consent to the search.
While Susan acknowledged that the form called for a full search of the premises, she said she thought the police were basically going to search the area where they had found the marijuana. This belief was based on a comment by the officer who presented the form, to the effect that he wanted to search the corn field. Additionally, Susan did not feel there was anything to search for in the house.
After hearing the above testimony, the trial court found that Susan's consent was voluntary. Of importance to the court were several factors, including Susan's education and superior intelligence, the lack of evidence of actual threats, and the fact that she acknowledged reading and understanding the forms she signed. Additionally, the court found that the scope of consent was not exceeded. In this context, the court did not appear to find Susan's testimony credible. The court noted that she had originally given permission to search the field, and that the written scope of the search, which she admitted reading, clearly exceeded the original verbal permission.
The trial court did specifically note Susan's testimony to the effect that the police said things could get rough if she did not sign the consent form. However, the court did not make a specific finding about this testimony, but merely said later in its decision that "[n]o evidence, however, has been presented showing that she was actually threatened into signing the forms."
In evaluating the trial court's decision, we start with the following well-established rule that "the trial court assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses. State v. Retherford (1994), 93 Ohio App.3d 586,592, discretionary appeal overruled, 69 Ohio St.3d 1488 (citation omitted). "Our function, then, is to accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." Id.
The legal standard for warrantless searches is that they are "per se unreasonable," unless a well-defined exception like voluntary consent applies. State v. Sneed (1992), 63 Ohio St.3d 3,6-7, cert. denied (1993), 507 U.S. 983, 113 S.Ct. 1577,123 L.Ed.2d 145. Consent does not need to be obtained from the defendant, but may be gained from another person with authority over the premises. Id. at 7. Furthermore, "[v]oluntariness is a question of fact and depends on the totality of the circumstances," with the government having the burden of proving that the consent was given freely and voluntarily. Retherford,93 Ohio App. 3d at 596, quoting from Schneckloth v. Bustamonte
(1973), 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854. To assess the totality of circumstances, the trial court in the present relied on a six-factor test outlined in State v. Gutierrez (July 17, 1996), Medina App. No. 2515M, unreported. This test was taken from United States v. Shabazz (5th Cir. 1993), 993 F.2d 431, and has been consistently used by the Fifth Circuit for many years to assess the voluntary nature of consent. The six factors are as follows:
 "(1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found."
Id. at 438, quoting from United States v. Olivier-Becerril (5th Cir. 1988), 861 F.2d 424, 426. In Shabazz, the court also noted that no single factor is dispositive. Id.
We find this test useful in evaluating the voluntariness of consent. After applying the above factors to the circumstances of the present case, we believe the trial court erred in finding Susan Forrester's consent voluntary, at least based on the trial court's current resolution of the facts. Our concern in this regard relates to the second factor in the Shabazz test, i.e., the presence of coercive police procedures. In this regard, we note that Susan's testimony about police threats was unrebutted. The State did not bring in Detective Polston, who obtained the search warrant, nor did the State present testimony from any other officer who was present during the time Susan's consent was being obtained. Instead, the State chose to offer essentially irrelevant testimony from an officer who arrived on the scene after Susan had signed the consent form.
In this regard, we make several observations. First, if an officer has a basis for obtaining a search warrant and informs an individual that a warrant can be procured, that fact does not render consent involuntary. See, e.g., State v. Clelland (1992),83 Ohio App.3d 474, 481, and State v. Reed, (Dec. 13, 1993) Morgan App. No. CA92-9, unreported. Therefore, the fact that Detective Polston may have told Susan that he could (and would) obtain a search warrant would not render Susan's consent involuntary, if the police had probable cause for a warrant. On the other hand, threats used to obtain consent, if believed, can render consent involuntary.
As the court noted in Clelland, a finding of voluntariness is appropriate where the record "clearly reveals no coercion."83 Ohio App. 3d at 481. In the present case, we are troubled by the unrebutted testimony of Susan Forrester, which if believed, indicates that the police threatened a pregnant woman with force to induce her to agree to a warrantless search. Although the trial court could have chosen to disbelieve Susan's testimony, the court did not specifically indicate that this was the case. Instead, the court said only that "[n]o evidence, however, has been presented showing that she was actually threatened into signing the forms." We disagree that no evidence was presented. To the contrary, unrebutted evidence was presented, and the trial court's failure to make a finding on this critical fact requires that we reverse the decision on the motion to suppress. While we defer to the trial court's findings on credibility, a failure to make findings deprives us of the ability to meaningfully review the court's decision. Compare, State v. Hunter (Feb. 26, 1997), Hamilton App. No. 960431, unreported (trial court decision on suppression upheld where the court specifically said witnesses' demeanor was considered and that certain witnesses were more credible than others). See also, State v. Kovacs (October 15, 1992), Cuyahoga App. No. 61079, unreported, appeal dismissed (1993), 66 Ohio St.3d 1420 (affirming decision to suppress where threats were used to obtain consent, including a threat that if officers "had to get a warrant they would make a mess and tear the place apart").
In light of the preceding analysis, we conclude that the trial court erred in finding Susan's consent to be voluntary, at least in the absence of findings on the critical issue of whether the police used threats or coercion to obtain her consent to search. As a result, the Defendant's assignment of error is sustained and this case must be remanded for further proceedings.
We note that in addition to the voluntariness of the consent, Defendant has raised a second issue, i.e., the scope of the consent. Specifically, Bruce Forrester contends that the police search exceeded the scope of the consent given by his wife. The trial court disagreed, finding that the consent form gave the police the right to search the entire property and exceeded the original verbal permission to search the cornfield. Because this case is being remanded for further hearing, we need not reach the issue of whether the search, if voluntary, exceeded the scope of Susan's Forrester's consent. Again, we note that Susan Forrester's testimony was the only evidence presented on this point, and that the State has the burden to show that a search is performed within the scope of the consent. See, State v.Arrington (1994), 96 Ohio App.3d 375, 377.
Having concluded that the trial court erred in ruling on the issue of voluntary consent, the Defendant's single assignment of error is sustained, and this case is remanded for further hearing. In this regard, we make one additional finding about a matter not raised by the Defendant. At the plea hearing on March 5, 1997, the Defendant pled guilty to all three counts as charged, but the trial court merged counts I and II, based on the court's analysis of the facts of record, statutes, and case law. However, the judgment entry imposing sentence failed to reflect the merger and the Defendant was sentenced to a definite period of one year on each of the three counts. Since this sentence is inconsistent with the prior merger, the judgment entry imposing sentence was in error. Although this particular error is moot in light of our decision to reverse and remand, the same situation could possibly arise again. As a result, we felt we should bring this matter to the trial court's attention.
Based on the above discussion, the judgment of the trial court is REVERSED and this case is remanded for further hearing.
WOLFF, J., and FAIN, J., concur.
Copies mailed to:
William F. Schenck
Robert K. Hendrix
Matthew Ryan Arntz
Hon. Thomas Rose