UNITED STATES of America,
Plaintiff–Appellee,

v.

Santos Menendez HERNANDEZ and Rigoberto Rosal, Defendants–Appellants.

No. 89–1538.

United States Court of Appeals,
Fifth Circuit.

May 10, 1990.

Rafael Salas, El Paso, Tex., for Hernandez.

Ray Velarde, court-appointed counsel, El Paso, Tex., for Rosal.

Joseph Douglas Wilson, Atty., Appellate Section, Crim. Div., U.S. Dept. of Justice, Washington, D.C., LeRoy Morgan Jahn, Asst. U.S. Atty., Helen M. Eversberg, U.S. Atty., San Antonio, Tex., for U.S.

Before CLARK, Chief Judge, WISDOM and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Following the denial of their motion to suppress the evidence of 4,500 pounds of marihuana found in their possession, defendants Santos Menendez Hernandez and Rigoberto Rosal were convicted by a jury of conspiracy to distribute and to possess with intent to distribute over 1,000 kilograms of marihuana and of possession with intent to distribute more than 1,000 kilograms of marihuana, both in violation of 21 U.S.C. § 841(a)(1). The defendants now argue that their convictions should be overturned based upon denial of their motion to suppress the evidence. Finding no error, we affirm.

I.

Following an informant's tip that a major drug conspiracy was afoot in the El Paso area, the Federal Bureau of Investigation (FBI) established surveillance on several suspected drug traffickers. Approximately two months into the investigation, agents observed certain activity that led them to suspect that the conspirators might be storing marihuana in a building on a used car lot. Two days after this suspicion arose, the agents observed a large tractor-trailer rig being driven into the car lot, where it remained backed up to the building for approximately an hour and a half. Agents then observed the defendants driving away in the truck. After a brief stop at a hotel where suspected drug conspirators were staying, the appellants drove east on Interstate 10.

After following the truck for approximately twenty-four hours and 600 miles, the FBI informed the Texas Department of Public Safety (DPS) that a truck believed to be carrying marihuana was traveling on

the interstate with no license plates. DPS discovered the truck, pulled it over, and ordered the defendants out of the cab. At DPS Officer Mohon's request, the defendants produced their driver's licenses and an invoice describing the cargo; they failed to produce evidence of Texas Interstate Commerce Commission (ICC) Motor Carrier authorization.

After examining the invoice handed to him by Rosal, Mohon then walked to the back of the truck and opened an inspection port, a small door used to check the temperature of the cargo. Upon opening the inspection port, Mohon immediately could smell the odor of marihuana. Mohon then asked Rosal for the keys to the cargo door. Before the door was opened, officer Vandygriff obtained Hernandez's signature on the English language version of a consent form, and both appellants were placed in handcuffs. The search of the truck revealed approximately 98 bales of marihuana (4,540 pounds) located behind a few crates of mangoes.

At the suppression hearing, Mohon testified that the invoice, which was a bill of lading, was unusual in that, out of the hundreds of bills of lading he had encountered, he had never before seen one that indicated that the cargo was being shipped to the driver. Hernandez testified that he did not understand English, did not understand the nature and meaning of the consent form, and did not give permission for the search of the truck.

The district court found that the stop was permissible because the truck did not display any license plates. The court further found that Mohon opened the inspection port as part of his duties under the Texas Motor Carriers Act (the Act). Moreover, the court disbelieved Hernandez's claim that he did not speak or understand English adequately to comprehend the consent form. Accordingly, the court found,

as an alternative holding, that the consent was valid and the search thus justified.

## II.

We do not address whether appellants validly consented to the search in the instant case; we affirm the denial of the motion to suppress on the district court's first holding only; that is, we find that the Act permits a DPS officer to inspect the load of a vehicle where he reasonably believes the vehicle is not exempt from coverage of the Act. We also find that the Act, in conferring such authority on DPS officers, does not violate the fourth amendment.

## A.

■■■■ Because the truck did not have license plates, Texas law enforcement authorities undeniably had the right to stop the truck. *See* Tex.Civ.Stat.Ann. arts. 6675a–3e § 5, 6701d § 153 (Vernon 1977).[1] Defendants first argue that because the officers did not stop them for the purposes of enforcing the vehicle code violation but rather as a pretext to search for drugs, the stop itself should not have been permitted. However, this argument is foreclosed by *United States v. Causey*, 834 F.2d 1179, 1184 (5th Cir.1987) (en banc), where we stated, "[S]o long as police do no more than they are objectively authorized and legally permitted to do, their motives in doing so are irrelevant and hence not subject to inquiry." *See also United States v. Basey*, 816 F.2d 980, 990 (5th Cir.1987).

■■■■ Moreover, the police officers would have the right to make a custodial arrest in response to the license plate violation. As explained in *Basey, id.* at 990 n. 17,

> Texas law authorizes warrantless misdemeanor arrests if an officer has 'probable cause to believe that the suspect has committed a crime *in his presence.*' *Bodzin v. City of Dallas*, 768 F.2d 722,

---

1. Although some evidence suggests that the FBI was aware that the truck was lawfully registered in another state despite the lack of license plates, this does not affect the authority of DPS officers to stop the truck, particularly as there is no evidence that the DPS officers knew any-

thing about the truck's actual registration status. From the perspective of a Texas DPS officer following the truck, the operator of the vehicle was probably violating art. 6675a–3e § 5 and, accordingly, could be stopped.

724 (5th Cir.1985) (emphasis in original; citing Tex.Code Crim.Proc.Ann. art. 14.-01(b) (Vernon 1977)); *see also Tores v. State*, 518 S.W.2d 378 (Tex.Crim.App. 1975) (stating that under Texas law officer may take driver into custody for any traffic offense except speeding).

 Although the license plate violation does provide probable cause to arrest, the violation alone does not provide probable cause to search the trailer compartment of a tractor-trailer truck. Generally, warrantless searches are considered unreasonable in violation of the fourth amendment. Certain exceptions are made to this rule, however. In *Basey, id.* at 991, the court identified three types of justifiable warrantless searches of an automobile: (1) a search incident to a lawful custodial arrest of an occupant of the automobile; (2) a "vehicle frisk" as part of a *Terry* [2] stop; and (3) a search under the "automobile exception" to the warrant requirement where probable cause and exigent circumstances are present.

The first two types will not ordinarily give officers the right to search a separated closed compartment area such as a trailer or trunk. We stated in *Basey*, "[W]hen a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." *Id.* (quoting *New York v. Belton*, 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981)). *See also Belton*, 453 U.S. at 460 n. 4, 101 S.Ct. at 2864 n. 4. Similarly, "when reasonable suspicion exists to support a *Terry* stop, officers can properly search a passenger compartment for self-protection." *Basey*, 816 F.2d at 991 n. 20.

 Permissible searches under the automobile exception, the third type of justifiable warrantless search of an automobile, must be based not merely upon probable cause to believe that a crime has been committed, but upon probable cause to believe that contraband or other such evidence that the government could properly seize is contained in the vehicle. As stated in *United States v. Reyes*, 792 F.2d 536, 538 (5th Cir.), *cert. denied*, 479 U.S. 855, 107 S.Ct. 191, 93 L.Ed.2d 124 (1986), "This circuit has consistently held that the automobile exception applies where there are both exigent circumstances and probable cause to believe that the vehicle in question contains property that the government may properly seize." Similarly, in *United States v. De los Santos*, 810 F.2d 1326, 1336–37 (5th Cir.), *cert. denied*, 484 U.S. 978, 108 S.Ct. 490, 98 L.Ed.2d 488 (1987), we stated, "A warrantless search of an automobile stopped by police officers who have probable cause to believe that an automobile contains contraband is permissible under the fourth amendment."

Thus, although the license plate violation provides probable cause for an arrest, it does not provide probable cause for a full vehicle search. We explained in *Basey*, "[A] separate search ..., unless the items examined were within the scope of the officers' justification for entering the dwelling, required probable cause or other independent legal basis because of the additional privacy interest invasion involved." 816 F.2d at 992.[3]

**B.**

We conclude, however, that the search was authorized under Tex.Rev.Civ.Stat. Ann. art. 911b (Vernon 1964), which regulates motor carriers. Section 16(d) of that article begins, "Any License and Weight Inspector or other peace officer of the Department of Public Safety, shall have the power and authority to make arrests without warrant for any violation of this Act except rate violations."

Included within art. 911b § 16(j) is the statement,

---

**2.** *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

**3.** *Cf. United States v. Lefkowitz*, 285 U.S. 452, 462–67, 52 S.Ct. 420, 422–24, 76 L.Ed. 877 (1932)

(holding that probable cause to believe certain individuals were members of a conspiracy did not give probable cause to search the contents of the room in which they were arrested).

Every such bill of lading, manifest, or bill of sale or load of commodities being transported for hire over the highways of this State shall be made available for inspection at any time and place upon the request of any officer or agent authorized to enforce the provisions of this Act under Section (d) hereof.

■■■ On its face this subsection entitles any DPS officer[4] (and especially a license and weight inspector such as Mohon) at any time to inspect any load of commodities being transported for hire over the highways of the state.[5]

At the trial level and on appeal, neither the defendants nor the government challenges Mohon's conclusion that the invoice from Meeho Brokerage, Inc., handed to Mohon by Rosal constituted a bill of lading. In his testimony, Mohon made much of its "suspicious nature"—that it indicated that the goods were being shipped to the driver—and that this gave Mohon reason to believe that the defendants were violating

section 16(j), which makes it unlawful to "use a false or fictitious ... bill of lading."

■■■ On the invoice, "J.C. PRODUCE S.A., HUNTS POINT, NEW YORK" was typed in the "SOLD TO" space, while "BY: ROBERTO ROSAL," was typed in the "SHIP TO" space. Thus, the invoice itself does not seem to support Mohon's interpretation; the invoice states that the mangoes were to be shipped *by* Roberto Rosal, not *to* him. As J.C. Produce S.A. was listed as the purchaser, one would assume, upon reading the invoice, that the mangoes were to be shipped to J.C. Produce in Hunts Point and, as stated on the invoice, that they were to be "shipped via receiver's truck."

At the hearing, Mohon did not directly state that the mere appearance of the driver's name in the "SHIP TO" space was itself unusual, but it is a fair inference from his testimony that this was what initially looked improper to him about the invoice.[6] Even though a perusal of the

---

4. Although section 16(j) grants broad authority in entitling a DPS officer to inspect any load of commodities being transported for hire over the highways of the state, the statute does not on its face run afoul of the fourth amendment. First, the application of the statute is still subject to the "reasonableness" requirement of the fourth amendment. Second, the state may regulate commercial trucking, and logically the reasonable expectation of personal privacy guaranteed by the fourth amendment is implicated to a lesser degree when dealing with searches of commercial cargo being carried by a commercial truck than with searches of one's person or personal possessions.

5. Section 16(j) states,

Every ... load of commodities ... shall be made available for inspection at any time and place *upon the request* of any officer or agent authorized to enforce the provisions of this Act.... [U]pon the failure of any person to permit inspection of the commodities being transported over the highways of this State ... [any authorized officer] shall be empowered to impound the load ... and hold same until properly released .... [Emphasis added.]

The officers made no formal request to inspect the load in the instant case. However, the statute ultimately empowers authorized officers to inspect any load of commodities transported for hire over the roads of the state; admittedly, in some cases that inspection would follow im-

poundment. Thus, no substantial right of appellants was violated by the failure of the officers to request permission to inspect the load before opening an unlocked inspection port—an act that caused no physical harm to defendants' truck.

6. At the suppression hearing, Mohon testified on direct examination as follows:

Q. [By Mr. Cronk] I'm going to hand you what's been marked Government's Exhibit Number 1 and ask if you can identify it.
A. [By Mohon] Yes, sir, this is a photocopy of the original invoice or manifest or bill of lading on the load that Defendant Rosal handed me that day.
Q. All right, and was there anything that you noticed about that particular document that aroused your suspicion?
A. Yes sir. Immediately when I looked who the load was sold it and who it was shipped to, I saw the driver's name. I had his drivers license, and it was the same name that was on the drivers license with the exception they misspelled his name on the manifest. Also there are some typographical errors on the cases, or the cartons of mangos.
 And this to me, when he signed it at the bottom and accepted the load, it is very unusual to see a manifest shipped to the driver that's driving a particular truck. Usually they're shipped to some produce company or store like Kroeger or Winn Dixie at a certain city.

invoice indicates that the mangoes were being shipped *by* Rosal rather than *to* him, Mohon's statement that generally loads of produce will be shipped to produce companies (and hence normally a produce company's name would appear in any "SHIP TO" space) is still valid.

The fact that it was necessary to insert a "BY" before the name in the "SHIP *TO*" space is itself an irregularity. Indeed, use of this invoice as a bill of lading is also suspect because, under the Texas Uniform Commercial Code's definition, a "bill of lading" is "issued by a person engaged in the business of transporting or forwarding goods." Tex.Bus. & Com.Code Ann. § 1.201(6) (Vernon 1968). The invoice here was issued by the seller rather than by the shipper and, moreover, it did not show the address of the shipper, which is also a violation of section 16(j).

Those irregularities, coupled with Rosal's inability to produce Texas ICC Motor Carrier authorization, were sufficient to give the officers probable cause to believe that the truck's cargo differed from what was stated on the invoice. Because we examine what the law objectively authorized Mohon to do, given the information he had and not on the basis of his subjective intent, *see Causey*, 834 F.2d at 1184, it is irrelevant that Mohon may have misinterpreted the invoice, so long as on its face the invoice, together with the lack of ICC authorization, supported probable cause.

■ Also, even if Rosal never intended the invoice to be presented as a bill of lading, a motor carrier should not be able to evade the Texas requirement of making available for inspection a valid bill of lading, manifest, or bill of sale, or the load of commodities, simply by not producing any of the subject documents. Where, as here, no proper documentation is produced, and DPS officers can reasonably conclude that the motor carrier is not exempt from the Act, there is probable cause to support a search of the load of commodities because of a probable violation of the Act. Thus, the search pursuant to section 16(j) was not unreasonable under the fourth amendment.

### C.

■ The defendants, though, suggest that they should be excluded from the reach of section 16(j),[7] as the last paragraph of that section states,

No provision of this Act will apply to any person who is engaged in the bona fide business of buying, selling and transporting any product or commodity when such person has in good faith purchased such product or commodity and at the time of and during the transportation thereof such person has and owns title to such product or commodity.

However, because the invoice stated that the goods were sold to a New York company, and because Rosal offered no contrary indication that he was the purchaser, the logical assumption for Mohon to have made was that Rosal was the shipper and not the owner of the mangoes. As such, the above-quoted last paragraph of section 16(j) would not operate to exempt Rosal from coverage under the Act.[8]

In addition, section 16(j)'s authorization to inspect loads of commodities presumes that such commodities are "being transported for hire." It again follows logically (from the invoice, which represents a New

Q. When you say 'unusual', what do you mean by that?
A. I've never seen one shipped to the driver before.
Q. How many times have you made stops of truckers and asked for their bill of lading or manifest?
A. Hundreds of times.

7. In fact, Texas courts have held that the exception contained in the last paragraph of § 16(j), where applicable, will not merely nullify the other provisions of that subsection but will function as an exemption to the whole Act. *See*

*State v. Ball*, 703 S.W.2d 727, 729 (Tex.App.—Dallas 1985, no writ).

8. If J.C. Produce employed Rosal or Hernandez, and transportation over the highways were merely incidental to J.C. Produce's business, then the Act might not apply. *See Cantu Trucking & Materials Co. v. State*, 735 S.W.2d 642, 645 (Tex.App.—Austin 1987, writ denied). However, nothing indicated that J.C. Produce employed Rosal or Hernandez. In particular, Hernandez's statement to the officers that his father (as opposed to J.C. Produce) owned the truck made this unlikely.

York company as purchaser and Rosal as shipper) that Rosal was transporting property for hire.

Therefore, Mohon had statutory authorization for the search. Where an objective assessment by an officer would suggest that the truck in question is subject to the inspection provisions of section 16(j), the officer should be permitted to act in accordance with those provisions. If all doubts were to be resolved in favor of finding the inspection provisions of section 16(j) inapplicable, any truck driver could immunize himself from regulatory monitoring by making even the barest assertion of being beyond the reach of the Act. Hence, we find that the defendants' vehicle was lawfully detained and that the officers could reasonably believe it was not exempt from the Act. Accordingly, the search was permissible.

AFFIRMED.