UNITED STATES of America,
Plaintiff,

v.

Alvester FORT, Defendant.

No. CRIM. 4:99–CR–212–D.

United States District Court,
N.D. Texas,
Fort Worth Division.

Jan. 18, 2000.

Daniel D. Guess, Special Ass't U.S. Atty., Fort Worth, TX, for plaintiff.

Peter Fleury, Ass't Federal Public Defender, Fort Worth, TX, for defendant.

## MEMORANDUM OPINION AND ORDER

FITZWATER, District Judge.

In this case involving a motion to suppress the fruit of a warrantless commercial vehicle regulatory inspection, the court holds that the stop was justified at its inception, and that running a warrant check on the driver was reasonably related in scope to the circumstances that justified the interference, because doing so did not extend what would otherwise have been the duration of the regulatory stop. The court therefore denies defendant's motion to suppress.[1]

### I

On September 4, 1999 Texas Department of Public Safety ("DPS") Trooper Mike Scales ("Trooper Scales"), a License and Weight inspector, was conducting commercial enforcement operations in Parker County, Texas on Interstate Highway 20, west of Weatherford, Texas. At approximately 8:00 a.m. Trooper Scales stopped defendant Alvester Fort ("Fort"), who was driving a commercial truck, for a routine commercial inspection.[2] This type of inspection includes such tasks as checking the driver's log book, his origin and destination, whether he is traveling interstate or intrastate, his bill of lading, and driver's license for proper type of vehicle, and performing a safety inspection of the vehicle. According to Trooper Scales, Texas has adopted the federal motor carrier regulations, which permit Texas officers to conduct routine inspections without first observing a violation of the law. Under

the regulations and/or DPS policy, he can inspect the vehicle, check the driver's physical condition and log book, and run a driver's license and wanted check. Normally, he first asks the driver to produce his log book, bill of lading, and driver's license. He conducted a level 2 safety inspection of Fort and his vehicle, see GX 2, in which he obtained ownership information, Fort's driver's license number, the license plate number, type of vehicle, details regarding the load Fort was carrying, and noted the violations discovered. Trooper Scales listed in his report that Fort had violations for no fire extinguisher, no current duty status, two tires with tread problems, wrong color tail lights, warning devices not displayed, battery not covered, damaged windshield, and defective speedometer. He ticketed Fort for not having a current record of duty status and a fire extinguisher, and issued a warning to him for a defective mud flap. See id. The citation notified Fort to appear before a Justice of the Peace on or before September 17, 1999.

Although Trooper Scales was authorized to remove the truck from service, he did not do so because there were no out of service violations. During the stop, Trooper Scales, acting according to DPS policy, requested that the dispatcher run license and wanted persons checks on Fort. DPS advised him that Fort had an outstanding warrant from the state of Louisiana for a probation violation. Trooper Scales asked that DPS confirm the warrant. The warrant reflected that the offense for which Fort had been placed on probation was possession of marihuana with intent to deliver. Trooper Scales completed his inspection report, and issued the citation, at 8:45 a.m. See id. He asked Fort if he was

1. The court sets forth in this memorandum opinion and order its essential findings pursuant to Fed.R.Crim.P. 12(e).

2. Trooper Scales testified at the hearing that as he was seated in his patrol car in the median, he could hear a sound emanating from the truck that indicated a tire was flat or had a flat spot. Fort objected to the govern-

ment's relying on this evidence as a basis for the stop. The court ruled that this objection was moot. The government acknowledged that it was offering this evidence only as background information and not as grounds for reasonable suspicion or probable cause to stop Fort.

aware of the warrant. Fort responded that he thought his lawyer had taken care of it. Trooper Scales advised Fort that he needed to take him to the Parker County Sheriff's Office to see if Fort could straighten out the matter. He could not recall at the hearing what amount of time lapsed between his receipt of notice of the warrant and taking Fort to the Parker County Jail. He told Fort to drive his truck to the Pilot Point Truck Stop in Weatherford and to lock the vehicle up. Fort did as instructed and Trooper Scales drove Fort from the truck stop to the Parker County Sheriff's Office. This trip took approximately five to ten minutes. At that point in time there had been no search conducted of the cab or trailer of Fort's vehicle. Other than having knowledge of the outstanding warrant for a probation violation based on a marihuana charge, the trooper had no indication that narcotics were present in the truck.

After arriving at the Sheriff's Office, Trooper Scales received written confirmation of the outstanding warrant and in turn advised Fort. The two discussed why Fort may not have received notice of the outstanding warrant (due to the fact that his estranged wife may not have passed mail along to him). Trooper Scales then turned him over to the Sheriff at the Parker County Jail at 9:20 a.m.

Due to the nature of the probation violation warrant, Trooper Scales contacted Trooper Trace McDonald ("Trooper McDonald"), a canine officer, and arranged to meet him at the Pilot Point Truck Stop where Fort's vehicle was still parked. He also contacted the Mineral Wells center to run an EPIC (El Paso Information Center) check, which accesses a database that reflects drug and narcotic trafficking, for any intelligence on the trucking company[3] and on Fort. Due to the holiday weekend, the EPIC response was slow. Trooper McDonald's drug dog alerted on the truck between the cab and the trailer but because the dog did not go to the source (truck or trailer), it could not be determined where the odor was coming from. Trooper Scales continued to await the EPIC response, which he did not receive until 12:30 or 1:00 p.m. DPS advised him that the Drug Enforcement Administration ("DEA") had two open files on the trucking company and Fort, and that DEA requested that it be contacted on the next working day.

Trooper Scales then decided to conduct a more detailed search of Fort's vehicle. He and Trooper David Mohon ("Trooper Mohon") went to the Parker County Jail. He had Fort step out of the jail and asked him whether he was transporting anything. Fort said "No." Trooper Scales then asked his permission to look inside the truck and the trailer. Fort said that would be fine.[4] When Trooper Scales asked Fort for his keys, he responded that they were with his friend "Levy," who had been riding in the truck with him.[5] Trooper Scales had not observed the presence of any other person during his initial inspection of the Fort vehicle.

Trooper Scales radioed Trooper McDonald to meet Trooper Mohon and him at the Pilot Point Truck Stop. He then entered the truck stop to look for Levy, but did not find him. The three troopers then searched the truck and trailer. The ca-

**3.** Trooper Scales testified that Fort was operating a vehicle with "Bama Trucking" markings and that this was a carrier with which he was unfamiliar.

**4.** At the suppression hearing, the court raised *sua sponte* the question whether Fort's motion should be denied based on his having consented to the search. In view of the reasoning the court follows in denying Fort's motion, the court need not decide whether Fort's motion should be denied based on his having consented to the search.

**5.** According to the government's response, Levy was later identified as Cornelius Levy, a second occupant of the vehicle, who was allowed to leave the area. P. Resp. at 2. Neither party introduced detailed evidence at the suppression hearing concerning this individual.

nine dog walked around the truck. The driver's side door was unlocked and the troopers directed the canine to enter the truck, but the dog showed no interest. They then broke the seal[6] on the trailer door, opened it, and entered the trailer, where they found a bulk load of potatoes. Trooper Scales observed that the potatoes looked like they had been skinned up a lot, and they emitted a bad smell. Trooper McDonald entered the trailer to examine the load, where he observed wooden pallets stacked up. He moved the pallets and discovered six black canvas duffel bags that measured approximately 3–4 feet by two feet. Upon opening the bags, the troopers discovered 41 bundles of marihuana, wrapped in plastic, that weighed 561.2 pounds. A wrecker then removed Fort's vehicle from the truck stop and the marihuana was transported to the Weatherford Police Department for safekeeping. The grand jury later indicted Fort for the offense of possession with intent to distribute marihuana, in violation of 21 U.S.C. § 841(a)(1).

## II

Fort moves to suppress all evidence and information obtained as a result of the stop and seizure and the subsequent search of his truck and trailer. He contends that Trooper Scales had no right under Texas law to stop his truck and therefore could not detain the vehicle for inspection. He argues that even if the stop was authorized under Texas law, it violated his right to be free from unreasonable searches and seizures and his right to travel. Fort argues that even in the context of a highly regulated commercial industry, there must be some articulable and reasonable basis or some other neutral criteria for the stop to be lawful. Otherwise, the stop is impermissibly random and standardless.

---

**6.** The seal is an aluminum strip that bears a number that matches the one on the bill of lading.

**7.** Fort does not challenge the detention and search and seizure that followed the conclu-

Fort posits that even if the stop was proper, his Fourth Amendment rights and right to travel were violated when Trooper Scales detained him for the purpose of interrogating him and running a warrant check. He maintains that because Trooper Scales had no basis to suspect that he had committed an offense, traffic violation, or safety violation, once the safety inspection had been completed, he should have been freed to go on his way. Fort attempts to distinguish between continued detention of a person who is detained after an officer observes him committing a violation, and detention of a commercial vehicle to check for safety violations. He argues that in the commercial context, the officer is permitted to prohibit further use of the truck but not to check the driver's license, conduct a warrant check, or detain the driver (except to the extent necessary to detain the truck for inspection).[7]

## III

"The Fourth Amendment prohibits unreasonable searches and seizures." *United States v. Shabazz*, 993 F.2d 431, 434 (5th Cir.1993). The stop and detention of Fort was a seizure within the meaning of the Fourth Amendment. *Id.*

■ Courts that evaluate challenges to routine warrantless stops for violating traffic laws—*i.e.*, limited seizures that closely resemble investigative detentions—analyze them using the two-step formulation of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See United States v. Zucco*, 71 F.3d 188, 190 (5th Cir.1995); *Shabazz*, 993 F.2d at 434–35. The court determines "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Sha-*

---

sion of the stop (*i.e.*, the canine search and entry into the truck and trailer) except as fruit of the poisonous tree. *See* D. Mot. Suppress at 8.

*bazz,* 993 F.2d at 435 (quoting *Terry,* 392 U.S. at 20, 88 S.Ct. 1868). Although a regulatory stop—not a stop based on an observed violation of a traffic law—is at issue in the present case, at least one circuit has applied *Terry*'s two prongs in addressing a motion to suppress that arose from such a stop. *See United States v. Burch,* 153 F.3d 1140, 1142–43 (10th Cir.1998). *Burch* appeared to assume that the first prong of *Terry* was to be assessed by applying the principles that govern regulatory searches. *See id.* at 1141. It was undisputed in *Burch* that the state trooper's action in stopping the defendant's semi-tractor/trailer was justified at its inception. *Id.* ("There is no dispute that Trooper Smith's action was justified at its inception pursuant to the regulatory search exception to the Fourth Amendment's warrant requirement."). *Id. Burch* then addressed whether the trooper's inspection of the interior of the truck to check blocking and bracing, after he had issued a clean inspection report and returned the driver's paperwork, "was 'reasonably related in scope to the circumstances that first justified the interference.'" *Id.* at 1142 (quoting *United States v. Gonzalez–Lerma,* 14 F.3d 1479, 1483 (10th Cir.1994)). Fort advances a two-fold suppression argument that relates in all pertinent respects to the two components of *Terry.* He contends for various reasons that the stop was not justified at its inception. He maintains that even if it was, Trooper Scales exceeded the scope by detaining him after the safety inspection had been completed for the purpose of interrogating him and running a warrant check, absent a basis to suspect that he had committed an offense, traffic violation, or safety violation. Absent controlling Fifth Circuit authority and any indication that this circuit would follow a different analytical path,[8] the court agrees with *Burch* and analyzes the commercial stop in this case under the two prongs of *Terry,* integrating into the analysis of the

first step the regulatory search principles of *New York v. Burger,* 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987).

## IV

Fort contends that Trooper Scales had no right under Texas law to stop his truck and therefore could not detain the vehicle for inspection, and that for the stop to be lawful, Trooper Scales must have had some articulable and reasonable basis or some other neutral criteria.

■ Warrantless inspections of closely regulated businesses are permissible if (1) "there [is] a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made[,]" *id.* at 702, 107 S.Ct. 2636 (citing *Donovan v. Dewey,* 452 U.S. 594, 602, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981)); (2) "the warrantless inspections must be 'necessary to further [the] regulatory scheme[,]'" *id.* (quoting *Donovan,* 452 U.S. at 600, 101 S.Ct. 2534); and (3) "'the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant[,]'" *id.* at 703, 107 S.Ct. 2636 (quoting *Donovan,* 452 U.S. at 600, 101 S.Ct. 2534). There can be little doubt that commercial trucking is a closely regulated industry in the state of Texas. *See, e.g.,* Tex. Transp. Code Ann. §§ 621.001–645.004 (West 1999 & Supp. 2000); *United States v. Hernandez,* 901 F.2d 1217, 1220–1222 (5th Cir.1990) (addressing Texas motor carrier regulation in context of probable cause for DPS search of tractor-trailer rig); *V–1 Oil Co. v. Means,* 94 F.3d 1420, 1426 (10th Cir.1996) ("Motor carriers are closely regulated by both state and federal governments.").

■ The warrantless inspection in this case was permissible under the *Burger* test. First, Texas has a substantial government interest in traveler safety and in

---

**8.** *Cf. Shabazz,* 993 F.2d at 435 (noting that Supreme Court and Fifth Circuit have used *Terry* to analyze cases in which motorists were stopped for violating traffic laws).

reducing taxpayer costs that stem from personal injuries and property damage caused by commercial motor carriers, and this interest informs the regulatory scheme pursuant to which the inspection is made. Second, warrantless inspections are necessary to further the regulatory scheme because Texas must be able to conduct driver and vehicle safety checks for problems that may not be apparent to officers on patrol.[9] Third, the statute's inspection program, in terms of the certainty and regularity of its application, provides a constitutionally adequate substitute for a warrant.

█ At the suppression hearing, Fort appeared to challenge the third *Burger* prong through evidence that there are so many vehicles that travel on Interstate 20 and elsewhere in Texas, and so few DPS officers, that the stops that are made are too random to satisfy this element. The court disagrees. To satisfy *Burger,* the statute "must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers." *Burger,* 482 U.S. at 703, 107 S.Ct. 2636. The Texas statutory scheme meets both requirements. Texas law provides property owners with adequate notice that their vehicles may be seized and searched on highways, Tex. Transp. Code Ann. § 644.103 (West Supp.2000),[10] and limits the discretion of the inspecting officers, *id.* and *id.* § 644.104 (West Supp.2000).[11]

9. For example, a driver may be operating a commercial vehicle well beyond the regulatory limit on driving hours, but his observable conduct on the road does not reveal this fact at the time a trooper observes him. Only a check of the driver's log will disclose, and enable the DPS trooper to prevent, the potential danger to the public posed by such a driver.

10. Tex. Transp. Code Ann. § 644.103 (West Supp.2000):

(a) An officer of the department may enter or detain on a highway or at a port of entry a motor vehicle that is subject to this chapter.

(b) A police officer who is certified under Section 644.101 may detain on a highway or at a port of entry within the territory of the municipality a motor vehicle that is subject to this chapter.

(c) An officer who detains a vehicle under this section may prohibit the further operation of the vehicle on a highway if the vehicle or operator of the vehicle is in violation of a federal safety regulation or a rule adopted under this chapter.

(d) A noncommissioned employee of the department who is certified for the purpose by the director and who is supervised by an officer of the department may, at a fixed-site facility, enter a motor vehicle that is subject to this chapter. If the employee's inspection shows that an enforcement action, such as the issuance of a citation, is warranted, the supervising officer must take the action.

(e) The department's training and other requirements for certification of a noncommissioned employee of the department un-

der this section must be the same as the training and requirements, other than the training and requirements for becoming and remaining a peace officer, for officers who enforce this chapter.

11. Tex. Transp. Code Ann. § 644.104 (West Supp.2000):

(a) An officer or employee of the department who has been certified for the purpose by the director may enter a motor carrier's premises to:

(1) inspect real property, including a building, or equipment; or

(2) copy or verify the correctness of documents, including records or reports, required to be kept or made by rules adopted under this chapter.

(b) The officer or employee may conduct the inspection:

(1) at a reasonable time;

(2) after stating the purpose of the inspection; and

(3) by presenting to the motor carrier:

(A) appropriate credentials; and

(B) a written statement from the department to the motor carrier indicating the officer's or employee's authority to inspect.

(c) The department may use an officer to conduct an inspection under this section if the inspection involves a situation that the department determines to reasonably require the use or presence of an officer to accomplish the inspection.

(d) The department's training and other requirements for certification of a noncommissioned employee of the department under this section must be the same as the

Trooper Scales' stop of Fort was justified as a regulatory seizure.

## V

Fort next contends that even if the stop was proper, Trooper Scales violated his Fourth Amendment rights and right to travel by detaining him after the safety inspection had been completed for the purpose of interrogating him [12] and running a warrant check without a basis to suspect that he had committed an offense, traffic violation, or safety violation.

## A

Under *Terry*'s second element, the court inquires whether performing the warrant check was reasonably related in scope to the circumstances that justified the interference in the first place. *Shabazz*, 993 F.2d at 435 (citing *Terry*, 392 U.S. at 20, 88 S.Ct. 1868).

In the context of traffic stops based on observed violations of traffic laws, courts have frequently held that it does not exceed the scope of the circumstances that justified the interference in the first place for police to request a driver's license, insurance papers, run a computer check thereon, and issue a citation. *United States v. Dortch*, 199 F.3d 193, 198–99 (5th Cir.1999) ("Like the defendants in *Shabazz*, Dortch cannot successfully claim that the detention until the computer check was complete exceeded its original scope. Because this was a valid traffic stop, the officers were permitted to request Dortch's license and the registration or rental papers for the car and to run a computer check thereon."); *Shabazz*, 993 F.2d at 437 ("Appellants concede, and we have no doubt, that in a valid traffic stop, an officer can request a driver's license, insurance papers, vehicle registration, run a computer check thereon, and issue a

citation."); *Zucco*, 71 F.3d at 190 (same); *United States v. Walker*, 933 F.2d 812, 816 n. 2 (10th Cir.1991) ("Under the reasoning of *United States v. Morales–Zamora*, 914 F.2d 200 (10th Cir.1990), our determination that the defendant was unlawfully detained might be different if the questioning by the officer did not delay the stop beyond the measure of time necessary to issue a citation. For example, this case would be changed significantly if the officer asked the same questions while awaiting the results of an NCIC [National Crime Information Center] license or registration inquiry."); *United States v. Guzman*, 864 F.2d 1512, 1519 (10th Cir.1988) ("An officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation."). In *Shabazz* the Fifth Circuit held that "[b]ecause the officers were still waiting for the computer check at the time that they received consent to search the car, the detention to that point continued to be supported by the facts that justified its initiation." *Shabazz*, 993 F.2d at 437. The Fifth Circuit held in *Zucco* that the seizure of a driver stopped for driving erratically down an interstate highway did not exceed the scope of the circumstances warranting the stop when the defendant gave consent to search before or during the time of the NCIC check. *Zucco*, 71 F.3d at 191. "[T]he law enforcement interest to be served by running a computer check on the license of someone stopped for a traffic violation is unquestioned." *Shabazz*, 993 F.2d at 437; *see Zucco*, 71 F.3d at 191 n. 11 ("In this case it is clear that the seizure did not exceed the scope of the circumstances giving rise to it. The officers were warranted in continuing the initial stop for the reasonable period required to receive the NCIC response.").

---

training and requirements, other than the training and requirements for becoming and remaining a peace officer, for officers who enforce this chapter.

**12.** Although it is not clear that Fort advances this argument separately, it is pellucid that Trooper Scales did not violate Fort's Fourth Amendment rights merely by interrogating him. *Shabazz*, 993 F.2d at 436.

■ In the present case the court finds that the time taken to run the warrant check on Fort did not extend the duration that would otherwise have been necessary to complete the regulatory stop.[13] Trooper Scales stopped Fort's vehicle at approximately 8:00 a.m. He completed his report and issued citations to Fort at 8:45 a.m. *See* GX 2. Trooper Scales could not recall precisely how long it took him to conduct the safety inspection, prepare and issue the inspection report and citations, or await the results of the warrant check. He did testify credibly, however, to the following crucial facts. Normally, he performs a warrant check while he waits for a driver to update his log book and bring it to him in his patrol car. He probably followed his normal procedure in this case. He probably asked Fort to catch up his log book and bring his registration receipts to the patrol car. It can take a driver five or 15 minutes to catch up his log book. Absent contrary evidence, the court finds that Trooper Scales requested the warrant check, and obtained the results, while waiting for Fort to update his log book. Therefore, running the warrant check did not lengthen what would otherwise have

been the usual duration of the stop. Moreover, Trooper Scales testified credibly that once he completed his report, he asked Fort whether he was aware of the warrant outstanding against him and Fort advised him that he thought his lawyer had taken care of the matter. This evidence corroborates that Trooper Scales had requested the warrant check, and received a response from the dispatcher, before he completed the stop.

## B

■ Perhaps in an attempt to distinguish the cases that hold that it is reasonable for officers to run warrant checks after an initial stop, Fort maintains that it was his *vehicle*, not *he*, that was subject to inspection, and that nothing about the stop of the commercial vehicle authorized Trooper Scales to run a warrant check absent a reason to suspect that he had committed an offense, traffic violation, or safety violation. The court disagrees.

First, the court discerns no basis in principle to decline to apply the usual rule that police officers who stop vehicles may

13. It may not be appropriate in all cases to conduct the scope inquiry exclusively or even primarily in temporal terms. In *Burch*, for example, the Tenth Circuit seemed to engage in a substantive inquiry, deciding whether the trooper's search of the truck interior to check blocking and bracing, after he had returned the driver's paperwork and issued a clean inspection report, exceeded the regulatory search authorized by Kansas law. *See Burch*, 153 F.3d at 1142. The court did not address the additional time required for this aspect of the seizure, but instead held that "[t]he clean inspection report did not remove the trooper's inspection from the scope of actions authorized by the circumstances that first justified the stop [because] [w]hen he issued the inspection report and returned Defendant's paperwork, [he] had not yet completed the inspection authorized by law." *Id.* (internal quotation marks and citation omitted). *Cf. Walker*, 933 F.2d at 816 n. 2 (suggesting that duration of detention affected lawfulness).

 The Fifth Circuit appears to have taken a temporal approach, however, in *Shabazz*. There the defendants based their scope argument on the fact that they were stopped for

speeding but that police officers then questioned them about their stay in Houston. *Shabazz*, 993 F.2d at 436. The defendants asserted that such questioning was "wholly unrelated to the initial justification for the stop, that is, speeding." *Id.* The Fifth Circuit analyzed the scope issue, not in substantive terms (*i.e.*, did questions about defendants' stay in Houston reasonably relate to the speeding), but instead in the context of whether the questioning "extend[ed] the duration of the initial, valid seizure." *Id.* at 437. Because it did not—the officers questioned the defendants while they were awaiting the results of a computer check of a driver's license, insurance papers, and vehicle registration—the court held that the detention did not violate *Terry*'s second prong. *Id.* The court reasoned that "[b]ecause the officers were still waiting for the computer check at the time that they received consent to search the car, the detention to that point continued to be supported by the facts that justified its initiation." *Id.*

 In view of *Shabazz*, the court will analyze the scope issue from a temporal perspective.

run warrant checks. Second, if the rule that applies to vehicle stops for traffic violations does not apply automatically to a regulatory seizure, the court finds sufficient basis to apply it on separate reasoning. Texas motor vehicle law is specifically concerned not only with commercial vehicles but with drivers of those vehicles. Section 644.103(c) of the Texas Transportation Code provides that "[a]n officer who detains a vehicle under this section may prohibit the further operation of the vehicle on a highway if the vehicle *or operator* of the vehicle is in violation of a federal safety regulation or a rule adopted under this chapter." Tex. Transp. Code Ann. § 644.103(c) (West Supp.2000) (emphasis added).[14] Section 522.071(a)(2) makes it unlawful to operate a commercial motor vehicle while one is disqualified from doing so. Tex. Transp. Code Ann. § 522.071(a)(2) (West 1999). Section 522.081 provides several grounds that disqualify an individual from operating a commercial motor vehicle. Tex. Transp. Code Ann. § 522.081 (West 1999). It was therefore well within the purpose for Trooper Scales' initial stop to run a warrant check to see if the driver had an outstanding violation of the law that disqualified him from lawfully operating the vehicle and thus warranted prohibiting further operation of the truck on the highway.

Moreover, in this case Trooper Scales issued citations to Fort and directed that he personally appear before a Justice of the Peace to respond to them. He did not issue *in rem* citations to the truck Fort was operating. And Trooper Scales specifically testified that two of the tasks he performs during a commercial inspection are to check the driver's physical condition and inspect his log book. These are safety-related verifications that relate to protecting the driving public from weary truck *drivers*, not from defective vehicles.

**C**

Fort also relied during the suppression hearing on the Fifth Circuit's recent decision in *Dortch.* The court holds that the reasoning of *Dortch* actually supports the decision the court reaches today, and that its conclusion that the evidence should have been suppressed is based on distinguishable facts.

*Dortch* supports the reasoning that the court follows today because it confirms that defendants cannot successfully claim that detention that occurs while a computer check is being completed exceeds the original scope of a valid traffic stop, and that officers are permitted to request a driver's license and registration and to run a computer check thereon. *Dortch,* 199 F.3d 193, 198–99.

Moreover, *Dortch* is otherwise distinguishable on its facts. In *Dortch* officers stopped defendant Dortch for a traffic violation. They called a dispatcher to run a computer check for warrants and to determine whether the car was stolen. The officers also called for a canine unit to be sent to the scene. At the time the officers spotted the canine unit, they informed Dortch that the computer check for outstanding warrants had been completed and had turned up nothing, but that the canine unit was going to perform a search. Dortch remained at the scene until the dogs arrived and performed their search, and his driver's license and rental papers remained with the officers on a clipboard. After the canine alerted in a manner that indicated that Dortch could be carrying drugs, officers conducted a pat down search that revealed he was carrying cocaine. Dortch moved unsuccessfully to suppress the evidence. The Fifth Circuit held that Dortch's Fourth Amendment rights were violated because the detention extended beyond the valid reason for the initial stop. The justification for detention

---

**14.** The version of § 644.103(c) to which the court refers took effect on September 1, 1999, prior to the date on which Fort was stopped.

ceased once the computer check came back negative. The canine search was not performed until after that check was completed. The search was unconstitutional because it occurred moments after the computer check was completed rather than moments before. Unlike the facts of *Dortch,* however, the court has found in the present case that the warrant check was completed during the time that Fort was catching up his log book, and the results were positive (showing that Fort had an outstanding warrant from Louisiana), not negative.

   \*     \*     \*     \*     \*     \*

The government established by a preponderance of the evidence that the initial stop was justified at its inception as a regulatory seizure and that running a warrant check on Fort did not extend what would otherwise have been the duration of the stop. The court therefore denies Fort's motion to suppress.

**SO ORDERED.**